2019 IL App (1st) 180771
No. 1-18-0771

SECOND DIVISION
July 25, 2019

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| MICHAEL TOWNSEND, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 16L1968 |
| | ) | |
| RICKY ANDERSON; DARRYL WARE; ROBIN | ) | The Honorable |
| BEAVERS; THE CITY OF CHICAGO, a | ) | Judge Kathy Flanagan, |
| Municipal Corporation; JAMES | ) | Judge Presiding. |
| LEWANDOWSKI; BRIAN WARCHOL; and | ) | |
| JASON MARTINO | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| (The City of Chicago, James Lewandowski, Brian | ) | |
| Warchol, and Jason Martino, Defendants- | ) | |
| Appellees). | ) | |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justice Mason concurred in the judgment and opinion.
Justice Hyman dissented, with opinion.

**OPINION**

¶ 1    Plaintiff Michael Townsend was injured in a car accident when the vehicle in which he was a passenger was struck by another vehicle driven by a man who had fled the scene of a traffic stop effectuated by several Chicago police officers. Townsend subsequently filed suit

against the City of Chicago and the three of the City's police officers who involved in the traffic stop and subsequent apprehension of the fleeing driver: Brian Warchol, Jason Martino, and James Lewandowski (collectively "defendants"). Defendants, in turn, filed a motion for summary judgment, arguing that they were immune from liability pursuant to the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2014)). The circuit court granted the motion, finding that defendants were immune from liability pursuant to section 4-106(b) of the Tort Immunity Act (745 ILCS 10/4-106(b) (West 2014)), a provision that immunizes public entities and their employees from liability for injuries inflicted by escaped or escaping prisoners. On appeal, Townsend argues that the circuit court erred in finding that his injuries were inflicted by an escaping prisoner and in granting defendants' motion for summary judgment. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3        On March 2, 2015, at approximately 6:30 p.m., Chicago police officers Pete Higgins and James Lewandowski effectuated a traffic stop on a red 2007 Toyota Solara near 1227 West Garfield Boulevard. At the time of the traffic stop, the vehicle contained four male occupants: Arieus Fitch, the driver; Darwin Walls, the front seat passenger; and Ricky Anderson and Cory Williams, the two backseat passengers. During the course of the traffic stop, after Fitch and Walls had exited the vehicle and were both handcuffed by the officers, Anderson slipped into the Solara's driver's seat and drove away from the scene. Several minutes later, Anderson struck another motor vehicle driven by Vernard Chapman near the intersection of Normal Boulevard and 63rd Street. Anderson and Williams were subsequently apprehended by Officers Warchol and Martino, who arrived at the scene of the crash shortly after the impact. Townsend, who was a

passenger in Chapman's vehicle at the time of the crash, sustained a number of injuries as a result of the collision, including head, neck, back, shoulder, and hand pain.

¶ 4        Townsend subsequently filed suit against the City of Chicago and several of the City's police officers, alleging that the officers engaged in a wrongful and unsafe pursuit of Anderson, which caused Anderson to drive erratically and resulted in him striking Chapman's vehicle and injuring plaintiff. Specifically, in Townsend's second amended complaint, he included claims of willful and wanton conduct against Officers Lewandowski, Warchol, and Martino. Townsend also included a willful and wanton conduct claim against the City, citing the conduct of its employees in engaging in the unsafe pursuit.[1] In addition to the aforementioned defendants, Townsend also named several other individuals as defendants in his second amended complaint, including Anderson.[2]

¶ 5        Defendants, in turn, filed a written answer and an amendment thereto. In their amended answer, defendants invoked various provisions of the Tort Immunity Act, including section 4-106(b), which immunizes public entities and public employees from liability for "[a]ny injury inflicted by an escaped or escaping prisoner." 745 ILCS 10/4-106(b) (West 2014).

¶ 6        The parties then engaged in discovery. In their discovery depositions, Officers Higgins and Lewandowski testified that they were on patrol when they encountered the red Solara driving eastbound on 55th Street. Because it was dusk and the vehicle was operating without its headlights illuminated, the officers curbed the vehicle. Officer Higgins approached the driver's side of the vehicle, and Officer Lewandowski approached the front passenger's side of the

---

[1]Townsend also included a spoliation of evidence claim against the City in his second amended complaint. The basis for the claim was the City's purported failure to properly retain the global positioning system tracking data from the police cars involved in the alleged pursuit. On appeal, he raises no argument concerning the circuit court's ruling on his spoliation of evidence claim, and as such, we need not discuss that claim any further.

[2]Because the other defendants and the claims advanced against them are not relevant to this appeal, we will not address those claims in this disposition.

vehicle. When Fitch, the driver of the Solara, was unable to produce a driver's license, Officer Higgins ordered him out of the vehicle and handcuffed him. Officer Lewandowski, in turn, noticed Walls, the front seat passenger, making furtive movements toward the floor of the vehicle and observed an opened container of alcohol near his person. As such, Officer Lewandowski ordered Walls out of the vehicle and began handcuffing him. At that point, Officer Higgins observed Anderson "jump[ ]" into the driver's seat and alerted his partner that Anderson "was getting in the front seat." When Officer Lewandowski looked over, Anderson was "already in the front seat and he was putting the car in gear and trying to take off while [Officer Higgins] was grabbing at him." Officer Higgins explained that he grabbed at Anderson because neither of the two backseat passengers was free to leave at that point. In response to Officer Higgins's efforts to "grab at him," Anderson said "something *** like [']why are you grabbing me.['] " Officer Higgins testified that Anderson was ultimately able to elude his efforts to restrain him and that he "dropped the car in gear and took off eastbound on 55th Street." Officer Higgins then relayed what had occurred over his radio, providing details about the fleeing car and the direction in which it was heading.

¶ 7      Shortly after making the radio broadcast, the officers' watch commander "gave a termination order," which Officer Anderson described as "an order from a supervisor saying not to pursue or not to chase a vehicle." Accordingly, Officers Anderson and Lewandowski did not immediately follow the Solara; rather, they remained at the scene where they had handcuffed Fitch and Walls. Approximately five minutes later, they heard a radio broadcast that Anderson and Williams were in custody. At that point, they relocated to the scene where Anderson and Williams had been detained by Officers Martino and Warchol after the Solara had struck another vehicle. The accident site was approximately two miles away from the scene of the initial traffic

stop. Upon arriving at the scene, the officers confirmed that the two men in custody were the occupants of the fleeing car.

¶ 8        Neither Officer Anderson nor Officer Lewandowski had any firsthand knowledge as to whether Officers Martino and Warchol had been engaged in a "pursuit" of the Solara at the time of the accident. Officer Anderson explained that, if the officers were simply in the general area when they encountered the vehicle, there was no "pursuit." He emphasized that a pursuit termination order does not preclude officers from driving in a safe manner without their lights and sirens activated to the area in which a suspect was last seen and looking for him. He did not recall hearing sirens or observing flashing lights at the scene of the crash. Similarly, Officer Lewandowki explained that, pursuant to his understanding of department policy, whether a "pursuit" occurs "depends on the circumstances" and that officers who observe a vehicle matching a radio broadcast description may follow behind that vehicle in an effort to confirm the identity of the vehicle or the suspects without necessarily "pursuing" the vehicle.

¶ 9        In their discovery depositions, Officers Warchol and Martino testified that they were on patrol in the same general vicinity of the aforementioned traffic stop when they heard a radio dispatch message relaying that a vehicle that had been stopped by another unit had fled from the scene. A short time later, the officers observed a vehicle matching the description of the red Solara from the dispatch message. According to Officer Warchol, the vehicle was driving eastbound on Garfield Boulevard at a "high rate of speed." Neither officer, however, was able to estimate the rate of speed at which the Solara was traveling. At the time of the sighting, the officers were stopped at a red light on an unknown "north-south street." When the light changed, Officer Warchol, the driver of the patrol vehicle, turned onto Garfield and traveled east. By that time, however, the Solara had turned southbound onto another street, and the officers lost sight

of the vehicle. Officer Warchol contacted dispatch about the sighting and relayed the direction in which the vehicle was traveling. After losing sight of the vehicle, the officers continued driving around the area. Officer Warchol could not recall if he activated his vehicle's lights and sirens, but he testified that it was not his standard practice to "automatically throw [his] lights and sirens" on. Officer Warchol testified that, at the time they were looking for the vehicle, he was not driving in excess of the speed limit. Officer Martino estimated that they were actually traveling "at or below" the posted speed limit because they were looking down intersections to see if they could spot the Solara. During their search, the officers "happened upon" the accident site. The officers did not observe the actual collision. When they arrived at the scene, the Solara was unoccupied. Eyewitnesses informed them that Anderson and Walls had fled on foot eastbound on 63rd Street. Officers Warchol and Martino ultimately apprehended the two men, who had boarded a Chicago Transit Authority bus located several blocks away. Other officers arrived at the accident scene shortly thereafter.

¶ 10    Both officers denied that they were engaged in a "pursuit" of the Solara prior to the accident. Officer Warchol emphasized that "there's a difference between following somebody and pursuing somebody." According to Officer Warchol, a pursuit occurs when an officer follows a vehicle that is not complying with the officer's active efforts to curb the vehicle. In this case, however, he and his partner lost sight of the vehicle shortly after encountering it. They then came upon the accident site after driving around the area in which they had last seen the Solara. Officer Martino, in turn, emphasized that their conduct was not in contravention of their department's pursuit termination policy, explaining that a termination order does not preclude officers from being "diligent" and "touring the area" in an effort to observe a suspect vehicle and its occupants.

¶ 11    An incident report completed by law enforcement personnel following the arrest of Anderson and Williams reveals that cannabis was recovered from Williams's pants pocket. Officers also recovered a loaded, unregistered, .45-caliber handgun. Anderson and Fitch were both subsequently charged with traffic offenses, and Williams was charged with possession of a controlled substance. Walls, in turn, was ultimately released without charges.

¶ 12    Various lay witnesses were also deposed during the discovery process and provided details about the events that transpired on the evening of March 2, 2015. Charles Johnson testified that he was traveling east on 55th Street that evening when he observed a red car that had been curbed by a police truck. Shortly thereafter, he saw the red car "barreling down" behind him. As the red car tried to maneuver around him, the car sideswiped the passenger side of his vehicle. Johnson estimated that the vehicle was traveling approximately 60 miles per hour. Approximately 40 seconds to 1 minute later, Johnson observed a police truck drive past him and travel in the same direction of the red vehicle. He did not know if the truck that was following the car was the same one that he observed at the traffic stop, but he testified that the truck appeared to be the same model as the police truck he had seen earlier. He estimated that the police truck was traveling at approximately 45 to 50 miles per hour. Johnson did not recall whether the police truck's lights and sirens were activated. After he was sideswiped, Johnson pulled into a nearby gas station, called 911, and reported what had occurred.

¶ 13    During his discovery deposition, Townsend recalled that he and his friend Vernard Chapman were traveling south on Normal when he felt an impact and heard a "boom" as a red car struck the rear passenger side of Chapman's vehicle. The red car then continued on and hit a parked car and a light pole. Townsend, who was sitting in the front passenger seat of Chapman's car at the time of the impact, hit his head on the door frame. He did not recall observing any

police vehicles prior to the accident but testified that one "zoomed up *** right after the accident." He estimated that the police car arrived two to three seconds after the impact. Townsend did not recall whether the police car had its lights and sirens activated. Shortly after that police car arrived at the scene, "quite a few" other police cars arrived at the crash site.

¶ 14 Darryl Ware, owner of the parked car damaged by the Solara, talked to a police officer who was in the area shortly after the accident. He was told that his car was damaged during the course of an "auto theft chase."

¶ 15 Townsend's friend, Chapman, was not deposed but submitted an affidavit. In his affidavit, Chapman averred that his vehicle was struck by a red car traveling south on Normal "at a very high rate of speed." A police truck also operating "at a high rate of speed" arrived at the scene "within a couple of seconds" of the accident. The truck "had its lights activated." Chapman further averred that he heard police sirens before the accident.

¶ 16 After completing the aforementioned discovery, defendants filed a motion for summary judgment. In the motion, defendants again asserted that they were entitled to immunity pursuant to section 4-106(b) of the Tort Immunity Act because Anderson was an "escaped prisoner" at the time of the traffic accident and, thus, they could not be subject to liability for Townsend's injuries. Alternatively, defendants argued that there was no evidence that they proximately caused the accident and Townsend's injuries. They noted that Anderson had not been deposed and, as such, there was no evidence as to why he fled the scene of the traffic stop, why he traveled at a high rate of speed, or whether he ever saw any police officers following him.

¶ 17 In response to defendants' motion, Townsend disputed the applicability of section 4-106(b) of the Tort Immunity Act. He also argued that there were genuine issues of material fact as to whether the defendant officers had been engaged in a dangerous and unauthorized high-

speed pursuit of Anderson at the time of the accident and whether their conduct was a proximate cause of his injuries.

¶ 18    In a detailed written order, the court granted defendants' motion for summary judgment. In doing so, the court initially found that there was "conflicting" evidence "as to whether a pursuit occurred" and "whether any acts on the part of the City and the officers proximately caused the accident." As such, the court rejected defendants' argument that lack of probable cause was a basis to enter summary judgment in their favor. The court, however, found that defendants were nonetheless immune from liability because Anderson was an "escaping prisoner" within the meaning of section 4-106(b) of the Tort Immunity Act at the time that he caused Townsend's injuries. The court reasoned:

> "Here, the police curbed a vehicle and began to question the occupants. The officers were in the process of handcuffing the driver and front seat passenger, when a backseat passenger, Anderson, jumped into the driver's seat to get away. The testimony of both Officer Higgins and Officer Lewandowski indicates that as Anderson got into the driver's seat, Officer Higgins grabbed him to stop him from leaving, but then he stepped on the gas and fled. Even applying the broadest interpretation of 'custody,' Anderson was a prisoner attempting to escape within the meaning of section 4-106. Consequently, the injuries the Plaintiff sustained from the collision with the vehicle that Anderson was driving were caused by an escaping prisoner, and the immunity afforded under section 4-106 applies. On the basis of the application of this immunity, summary judgment in favor of the City of Chicago and the individual officers would be appropriate."

¶ 19    This appeal followed.

¶ 20                        II. ANALYSIS

¶ 21    On appeal, Townsend argues that the circuit court erred in concluding that Ricky Anderson was an "escaping prisoner" pursuant to the Tort Immunity Act and in granting defendants' motion for summary judgment.

¶ 22    Defendants, in turn, respond that the court properly found that they were immune from liability under the Tort Immunity Act because the record clearly establishes that Anderson was an escaping prisoner when he fled the scene of a traffic stop, struck another vehicle, and caused Townsend's injuries.

¶ 23    Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2014). In reviewing a motion for summary judgment, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the moving party to determine whether a genuine issue of material fact exists. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). A genuine issue of fact exists where the material relevant facts in the case are disputed or where reasonable persons could draw different inferences and conclusions from undisputed facts. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). To survive a motion for summary judgment, the nonmoving party need not prove his case at this preliminary stage of litigation; however, the plaintiff must present some evidentiary facts, not mere speculation or conjecture, to support each element of his cause of action, which would arguably entitle him to a judgment. *Garcia v. Nelson*, 326 Ill. App. 3d 33, 38 (2001); *Peters v. R. Carlson & Sons, Inc.*, 2016 IL App (1st) 153539, ¶ 13; *Richardson v. Bond Drug Co. of Illinois*, 387 Ill. App. 3d 881 (2009). Although summary judgment has been deemed a "drastic means of disposing of litigation" (*Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)), it is nonetheless an appropriate mechanism to

employ to expeditiously dispose of a lawsuit when the moving party's right to a judgment in its favor is clear and free from doubt (*Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001)). The circuit court's ruling on a motion for summary judgment is subject to *de novo* review. *Weather-Tite, Inc. v. University of St. Francis*, 233 Ill. 2d 385, 389 (2009).

¶ 24   The Tort Immunity Act was enacted by the Illinois legislature in 1965 in response to the Illinois Supreme Court's abolishment of the common-law doctrine of sovereign immunity in its decision in *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 20 (1959). *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 43 (1998). Pursuant to that common-law doctrine, governmental entities were "afforded blanket immunity from all tort liability." *Id.* In enacting the Tort Immunity Act, the legislature "adopted the general principle from *Molitor* 'that local governmental units are liable in tort but limited this with an extensive list of immunities based on specific government functions.' " *Id.* (quoting *Burdine v. Village of Glendale Heights*, 139 Ill. 2d 501, 506 (1990)). The various immunities afforded to governmental entities pursuant to the Tort Immunity Act essentially serve as affirmative defenses, which if properly raised and proven by a public entity, bar a plaintiff's right to recover for a tort claim (*id.* at 44) and " ' "prevent the diversion of public funds from their intended purpose to the payment of damages claims" ' " (*DeSmet  v. County of Rock Island*, 219 Ill. 2d 497, 505 (2006) (quoting *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 490 (2001), quoting *Bubb v. Springfield School District 186*, 167 Ill. 2d 372, 378 (1995))). One of the immunities set forth in the Tort Immunity Act that "protect[s] local public entities and public employees from liability arising from the operation of government" (745 ILCS 10/1-101.1(a) (West 2014)) is the "escaped or escaping prisoner" provision set forth in section 4-106(b) (745 ILCS 10/4-106(b) (West 2014)). That provision provides, in pertinent part, that "[n]either a local public entity nor a public

employee is liable for *** [a]ny injury inflicted by an escaped or escaping prisoner." 745 ILCS 10/4-106(b) (West 2014).

¶ 25    The Tort Immunity Act's "escaped or escaping prisoner" provision was discussed in detail by the supreme court in *Reis v. City of Chicago*, 242 Ill. 2d 205 (2011). In that case, a Chicago police officer placed Demario Lowe, a man who was suspected of fleeing the scene of an accident, in the backseat of a squad car. While he was left briefly unsupervised, Lowe, who had not been handcuffed, managed to gain control of the police car and drove away from the scene. Officers subsequently pursued the fleeing vehicle, and during the course of that pursuit, Lowe struck another vehicle. The occupants of the vehicle were injured and subsequently brought suit against the City of Chicago. The cause subsequently proceeded to a jury trial, which resulted in a verdict in the plaintiffs' favor. Following the circuit court's denial of the City's motion for a judgment notwithstanding the verdict, the City appealed and argued that it could not be held liable for the plaintiffs' injuries because their injuries were caused by an escaping prisoner within the meaning of section 4-106(b) of the Tort Immunity Act. *Id.* at 208-12.

¶ 26    Upon review, our supreme court agreed with the City that it was immune from liability for plaintiffs' injuries, concluding that Lowe had been a prisoner who escaped police custody at the time that he stole the police vehicle and caused the accident. In doing so, the court began with the recognition that "[t]he Act does not require a formal arrest or imprisonment, but rather defines 'prisoner' as a 'person held in custody.' " *Id.* at 216 (quoting 745 ILCS 10/4-101 (West 2008)). After noting that the Tort Immunity Act did not define the term "custody," the court referred to Black's Law Dictionary. The court noted:

> "Black's defines [custody] as 'the detention of a person by virtue of lawful process or authority.' Black's Law Dictionary 442 (9th ed. 2009). Black's further defines 'physical

custody' as 'custody of a person (such as an arrestee) whose freedom is directly controlled and limited.' Black's Law Dictionary 1263 (9th ed. 2009). *** [A]n earlier edition of Black's explained that ' "The term [custody] is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession." ' " *Id.* at 216 (quoting *People v. Campa*, 217 Ill. 2d 243, 254 (2005), quoting Black's Law Dictionary 347 (5th ed. 1979))).

¶ 27        After reviewing dictionary definitions, the court then looked at how the term "custody" had been applied in different legal contexts. For example, in the context of the speedy trial statute, the court noted that the term "custody" was construed to be sufficiently broad to include a defendant who was in a day reporting center program. *Id.* at 216-17 (citing *Campa*, 217 Ill. 2d at 255). Moreover, the court noted that, "[i]n the *Miranda* context [(*Miranda v. Arizona*, 384 U.S. 436 (1966))], in which custodial interrogation triggers the requirement of the *Miranda* warnings, a person is considered in custody when a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *Id.* at 217 (citing *People v. Braggs*, 209 Ill. 2d 492, 506 (2003)).

¶ 28        Ultimately, after considering the aforementioned sources and authorities, the court concluded: "If the legislature had meant the term 'custody' to be so restrictive as to include only imprisonment, the legislature almost certainly would have used the term 'imprisonment' instead." *Id.* Although the court found it unnecessary to determine how broadly the term "custody" could be construed, it determined that that the term was "certainly broad enough" to encompass the scenario at issue. *Id.* Accordingly, the court concluded that Lowe was in custody when he was placed in the back of the squad car. At that point, his freedom of movement was limited, and no reasonable person would have felt free to leave. *Id.* Because Lowe was in

custody, he "met the definition of a prisoner under the statute," and he was thus an escaping prisoner at the time that he stole the police car, struck plaintiffs' vehicle, and caused their injuries. *Id.* at 218. Therefore, the court determined that the City was immune from liability pursuant to section 4-106(b) of the Tort Immunity Act.

¶ 29    Both parties rely on *Reis* to support their respective claims. Townsend notes that Anderson, unlike Lowe, was not under arrest and placed in the back of a police car at the time that he absconded with a vehicle and caused a traffic accident. He emphasizes that "Anderson was never told that he was suspected of committing any crime and, in fact, was never even spoken to by either officer." Defendants acknowledge that Anderson had not been arrested when he fled the scene of the traffic stop, but they submit that he was nonetheless in custody at that time because no reasonable person in his position would have felt free to leave the scene of the traffic stop. In support, defendants note that Anderson was sitting in the "back seat of a car that had been pulled over by police, with both the driver and front seat passenger physically restrained by the officers at the scene. At that point, the car and its occupants were under the officers' control."

¶ 30    Upon review, we agree with defendants. Initially, we note that neither Anderson nor any of the other three occupants of the Solara at the time of the traffic stop have been deposed. Accordingly, the only accounts of the circumstances of the traffic stop contained in the record are the accounts provided by Officers Higgins and Lewandowski. We reiterate that, in order to survive a motion for summary judgment, a plaintiff need not prove his case at this preliminary stage of litigation; however, he must nonetheless present some evidentiary facts, not mere speculation or conjecture, to support his cause of action. *Garcia*, 326 Ill. App. 3d at 38. Here, given Townsend's failure to provide a competing account of the traffic stop and the events that

transpired during that stop, this court's review is necessarily limited to the uncontradicted accounts provided by Officers Higgins and Lewandowski.

¶ 31    According to the deposition testimony provided by those officers, they curbed the Solara because it was operating without its headlights illuminated. After effectuating the stop, Officers Higgins and Lewandowski took positions on both sides of the vehicle, with Officer Higgins approaching the driver's side and Officer Lewandowski approaching the passenger's side of the car. The positioning of the officers effectively curtailed Anderson's and the other three occupants' freedom of movement.[3] See *Reis*, 242 Ill. 2d at 217 (explaining that an individual is in custody for purposes of the Tort Immunity Act when his "freedom of movement had been directly controlled and limited" by an officer's exercise of his "lawful authority"). Shortly after approaching the vehicle, the officers then ordered Fitch, the driver of the vehicle, and Walls, the front seat passenger, out of the Solara and placed both men in handcuffs. Officer Higgins handcuffed Fitch when he was unable to produce a valid driver's license, and Officer Lewandowski, in turn, handcuffed Walls when he observed Walls make several furtive movements and observed an open container of alcohol near his person.

¶ 32    Although it is true that there was no evidence that the officers suspected Anderson, one of the backseat passengers, of any criminal activity at that point, we do not believe that a reasonable person in his position would have objectively felt free to leave, given that two of the four occupants of the vehicle were physically restrained and the traffic stop had not yet concluded. *Id.* (a finding that an individual is in custody is supported by the fact that no reasonable person in his position would have felt free to leave). Indeed, courts reviewing traffic stops have recognized

---

[3]We note that neither officer specified whether the 2007 Solara was a two-door or a four-door vehicle. Moreover, the parties do not discuss the specific design of the car. A Wikipedia search reveals that the second generation Toyota Solara was manufactured between 2003 and 2008. Pictures of the second generation model depict a two-door design. See https://en.wikipedia.org/wiki/Toyota_Camry_ Solara (last visited July 23, 2019) [https://perma.cc/FXM4-WXED].

that police officers exercise control over all of the occupants of a vehicle that is subjected to a traffic stop. See, *e.g.*, *Brendlin v. California*, 551 U.S. 249, 255, 257 (2007) (recognizing that "during a traffic stop an officer seizes everyone in the vehicle, not just the driver" because "[a] traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road"); *People v. Johnson*, 408 Ill. App. 3d 107, 119 (2010) ("[T]he rule is clear that when an automobile is apprehended for a traffic stop, police have valid right to detain passengers as well as the driver."). Given the exercise of police authority during a traffic stop, courts have further recognized that a reasonable passenger involved in a traffic stop would not feel free to leave before the stop is concluded and permission to depart is given. See *Brendlin*, 551 U.S. at 257 (explaining that "[a]n officer who orders one particular car to pull over acts with an implicit claim of right based on fault of some sort, and a sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing. If the likely wrongdoing is not the driving, the passenger will reasonably feel subject to suspicion owing to close association; but even when the wrongdoing is only bad driving, the passenger will expect to be subject to some scrutiny, and his attempt to leave the scene would be so obviously likely to prompt an objection from the officer that no passenger would feel free to leave in the first place."); see also *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (recognizing "[a] lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of a driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave."). Although we are not equating the term "custody" as used in the Tort Immunity Act with "seizures," we nonetheless

find that the aforementioned fourth amendment jurisprudence provides further support for our conclusion that Anderson, as a passenger subjected to an ongoing vehicle stop in which both the driver and front seat passenger had been handcuffed, would not have reasonably felt free to leave the scene of that stop.

¶ 33     Moreover, Anderson's own conduct supports the conclusion that he did not subjectively feel free to simply exit the Solara and walk away from the scene of the traffic stop. Instead of doing so, Anderson maneuvered into the driver's seat when the officers' attention was diverted, evaded Officer Higgins's attempts to "grab at" him, and drove away at a high rate of speed. Based on Officer Higgins's uncontradicted deposition testimony, Anderson was evidently aware of the officer's efforts to physically restrain him after relocating to the driver's seat because Anderson inquired "why" Officer Higgins was attempting to do so. The mere fact that Anderson had not been handcuffed or formally arrested prior to fleeing the scene of the traffic stop does not, as Townsend appears to suggest, preclude a finding that he was in custody within the meaning of section 4-106(b) of the Tort Immunity Act because the term is not limited to situations involving "formal arrest or imprisonment." *Reis*, 242 Ill. 2d at 216 (citing 745 ILCS 10/4-101 (West 2008)).

¶ 34     Ultimately, given the elasticity afforded to the term, we conclude that Anderson was in custody at the time that he fled the scene of the ongoing traffic stop and that he was thus an escaping prisoner when he caused the traffic accident that resulted in Townsend's injuries. Although we acknowledge that the record contains discrepant evidence as to whether there was an unauthorized police "pursuit" of the Solara, these discrepancies have no bearing on the key issue concerning Anderson's status as an escaped or escaping prisoner. As our supreme court noted, "[t]he legislature chose not to focus on the conduct of law enforcement officials in

enacting [section 4-106(b) of the Tort Immunity Act], but rather worded it broadly to provide immunity for all injuries inflicted by escaping prisoners." *Id.* at 219. Because Townsend's injuries were caused by an escaping prisoner within the meaning of section 4-106(b) of the Tort Immunity Act, there is no genuine issue of material fact that defendants are immune from liability. The circuit court thus properly granted their motion for summary judgment.

¶ 35                              III. CONCLUSION

¶ 36        The judgment of the circuit court is affirmed.

¶ 37        Affirmed.

¶ 38        JUSTICE HYMAN, dissenting:

¶ 39        I respectfully disagree with the majority's conclusion that Anderson was in custody for purposes of the Tort Immunity Act. The parties and the majority look to *Ries v. City of Chicago*, 242 Ill. 2d 205 (2011), as the centerpiece of the analysis, but *Ries* does not provide as much guidance as they suggest. Certainly the supreme court in *Ries* thought so by not answering the question about how to define custody. *Id.* at 217 ("For purposes of this case, it is not necessary to define how broad the term 'custody' may be ***."). The court went on to expressly limit its conclusion to the facts before it. *Id.* (however defined, the word custody "is certainly broad enough to include situations such as this"). Nonetheless, the situation in *Ries* differs considerably from the situation here.

¶ 40        In *Ries*, an officer went to put gas in his supervisor's car. *Id.* at 208. He saw a group of people standing around a man, Demario Lowe, who members of the group said had been involved in a traffic accident and had tried to flee the scene. *Id.* The officer put Lowe in the back of his squad car. *Id.* Lowe was not handcuffed, and the car did not have a screen separating the back and the front, so he was able to get to the front and drive away. *Id.* As Lowe drove away,

the supervisor arrived and pursued Lowe. *Id.* During the pursuit, Lowe hit several parked cars and eventually blew a red light and hit the plaintiff's car, causing injuries to the plaintiff. *Id.*

¶ 41     The escapee in *Ries* knew he was under suspicion of a crime, having been identified to the officer as attempting to leave the scene of an accident. See 625 ILCS 5/11-402(a) (West 2008) (leaving scene of accident with vehicle damage a Class A misdemeanor). Here, the officers made no indication to Anderson or the other backseat passenger that they were the subjects of suspicion. The driver had been pulled over for a traffic infraction, and only the front seat passenger had been asked to get out of the car. The officer in *Ries* moved the escapee to the squad car, a location within the officer's control. Here, the officers left Anderson in the car in which he had originally been riding. The majority also suggests that Anderson was "aware of the officer's efforts to physically restrain him" because he asked "why" they were attempting to do so. In my view, this connotes Anderson's belief that he *was* otherwise free to leave, as he expressed surprise at the officer's efforts to detain him.

¶ 42     The majority correctly points out that the evidence in the record limits our review, but at the summary judgment stage we are to construe that evidence against the moving party (the City). *Keating v. 68th & Paxton, LLC*, 401 Ill. App. 3d 456, 470 (2010) (evidence viewed "in the light most favorable to the nonmoving party"). Given the record we have, construing the evidence in Townsend's favor requires us to presume Anderson's questioning of the officer, and even the simple act of his driving away, indicate a belief that he was free to leave.

¶ 43     I do not believe our supreme court directly imported the "free to leave" custody standard into the escaped prisoner provision of the Tort Immunity Act to the extent of the majority's interpretation. The court alluded to this possibility in *Reis* by citing cases that define custody in the context of an officer's requirement to give *Miranda* warnings (see *People v. Braggs*, 209 Ill.

2d 492 (2003)) and the speedy trial statute. See *People v. Campa*, 217 Ill. 2d 243 (2005), *abrogated on other grounds by People v. Clark*, 2019 IL 122891. These standards do not work so well for the purpose of defining "custody" as it is used in the Tort Immunity Act.

¶ 44     To determine whether a person is held in "custody" for the purpose of requiring *Miranda* warnings, asking whether a reasonable person would feel free to leave is only half of a two-part test. *Braggs*, 209 Ill. 2d at 506. Before even asking that question, a court must determine whether the circumstances surrounding an interrogation indicate a custodial event. *Id.* Our supreme court has enumerated at least 11 factors that go into this calculation. *Id.* In other words, "custody" in the context of *Miranda* warnings becomes largely self-defining. See *id.* ("a court should first ascertain and examine the circumstances surrounding the interrogation, and then ask if, *given those circumstances*, a reasonable person would have felt he or she was not at liberty to \*\*\* leave" (emphasis added)). The 11 factors inform the analysis of whether a person is free to leave. Indeed, those 11 factors are related to the precise ills that *Miranda* sought to remedy—an overly coercive interrogation. These factors are not helpful in the context of the Tort Immunity Act, which uses "custody" in a different sense.

¶ 45     Broader definitions of custody, employed by our supreme court in *Campa*, also fall short. For example, one of the definitions of "custody" is " 'control of a thing or person with such actual or constructive possession *as fulfills the purpose of the law or duty requiring it*.' " (Emphasis added.) *Campa*, 217 Ill. 2d at 253 (quoting Webster's Third New International Dictionary 559 (1993)). Legal dictionaries split custody into two types: "physical custody," requiring a subject's freedom to be " '*directly* controlled and limited' " (emphasis added), and "constructive custody," only requiring a subject's freedom to be " 'controlled by legal authority' " without direct physical control. *Id.* at 253-54 (quoting Black's Law Dictionary 412,

1193 (8th ed. 2004)). The court in *Campa* found that the definition of custody is "elastic" and can "encompass lesser forms of restraint than confinement." *Id.* at 254.

¶ 46     The facts of *Campa* give us some idea of what a "lesser form" of confinement looks like and, again, involve a much greater restriction of liberty than the officers' actions here. In *Campa*, the defendant was required to report to a day reporting program as a condition of his bail. *Id.* at 245-46. As part of the program, he was required to report Monday through Friday from 8 a.m. until 1:30 p.m. *Id.* at 246. In finding the program constituted an example of "custody," the court emphasized that the program required participants to "adhere to a schedule and engage in productive activities," subjected the participants to mandatory drug testing, and mandated anywhere from three to nine hours of physical presence at the center each day. *Id.* at 254-55. In *Campa*, as in *Ries*, a critical aspect of "custody" incorporates notice to the person subject to custody that he or she is under " 'a legal duty to submit.' " (Emphasis omitted.) *Campa*, 217 Ill. 2d at 257 (quoting *People v. Simmons*, 88 Ill. 2d 270, 273-74 (1981)). As I have said, no notice was given to Anderson.

¶ 47     *Campa* and *Braggs* demonstrate that the definition of "custody" is context specific and related to the purposes of the particular custodial situation. Indeed, *Campa* expressly says as much. *Campa*, 217 Ill. 2d at 254 ("The legislature intended that the term 'custody' evolve with the changing programs in our correctional institutions."); see also Webster's Third New International Dictionary 559 (1993) ("control of a thing or person with such actual or constructive possession *as fulfills the purpose of the law or duty requiring it*" (emphasis added)).

¶ 48     I believe we should not separate "custody" from the statutory context in which it arises—here, the Tort Immunity Act.

¶ 49        Construing definitions in statutes, "the task is not always properly accomplished by the mechanical application of the dictionary definitions of the individual words and phrases." *Whelan v. County Officers' Electoral Board*, 256 Ill. App. 3d 555, 558 (1994).Often, we read definitions in the context of the statutory scheme as a whole. Courts have struggled in other statutes to derive the meaning of "custody" in a statutory scheme that lacks context. See *People v. Smith*, 2014 IL App (3d) 130548, ¶ 26 (discussing definition of "custody" in section 5-8-7 of the Unified Code of Corrections (730 ILCS 5/5-8-7 (West 2004))). We, however, are not adrift like the court in *Smith*. The Tort Immunity Act provides contextual clues about the proper construction of the word "custody." The provision that refers the reader to "custody" states: "Neither a local public entity nor a public employee is liable for *** [a]ny injury inflicted by an *escaped or escaping prisoner.*" (Emphasis added.) 745 ILCS 10/4-106(b) (West 2014).

¶ 50        Here the meaning of "custody" must be understood by the word it seeks to define: "prisoner." The word "prisoner" means "[a] person who has been *apprehended* by a law enforcement officer *** regardless of whether the person has yet been put in prison." (Emphasis added.) Black's Law Dictionary 1314 ( 9th ed. 2010). The most natural reading of both the word "prisoner" and "apprehend" suggests a custodial situation much closer to formal arrest. See *People v. Maxey*, 2018 IL App (1st) 130698-B, ¶ 118 (we give language in statutes their natural and ordinary meaning). Only a highly strained definition of "custody," when read in the context of "prisoner," would apply to a backseat passenger in a car pulled over for a run-of-the-mill traffic stop—and even more so here, where the officers made no attempt to communicate to Anderson that he could not leave.

¶ 51        This interpretation also unites with the purpose of the Tort Immunity Act, which is to protect local public entities from liability under some circumstances. *Monson v. City of Danville*,

2018 IL 122486, ¶ 15. But the Tort Immunity Act only provides these protections when liability arises "from government operations." *Id.* We construe the Tort Immunity Act strictly against the entity seeking immunity because it departs from the common law. *Id.* We want officers to focus on their duties in the moment without fear of liability for the unpredictable actions that an apprehended person might take to frustrate the exercise of those duties. But to benefit from immunity, officers must ensure they have communicated to the person that he or she is subject to their control. Otherwise, an officer is not truly performing a "government operation," at least as to that person. This is particularly salient here, where Townsend's injury was caused by an accident allegedly related to a police chase. Is it reasonable for an officer to engage in a high-risk pursuit of a person that he or she has failed to adequately secure in the first place?

¶ 52    Furthermore, a reasonable backseat passenger traveling in a car pulled over for a traffic violation would not understand the term "prisoner" applied to him or her. Similarly, no reasonable person in this position would think he or she was "escaping" from any type of custody by leaving the scene. Absent direct communication or action by the officers, like the ones they took for the driver and front seat passenger, I cannot agree that Anderson and the other backseat passenger were in "custody" within the meaning of this provision of the Tort Immunity Act.

The General Assembly made a conscious choice when it linked the words "prisoner" and "custody." If the legislature intended section 4-106(b) to apply to a broader range of situations, it had broader language available. By borrowing words associated with fourth amendment traffic stop cases (*e.g.*, "seizure," "detention," etc.), the majority has suggested terms that could apply. Unless and until the legislature itself chooses those words, however, I would find that Anderson was not in "custody" and would reverse.

---

**No. 1-18-0771**

---

| | |
|---|---|
| **Cite as:** | *Townsend v. City of Chicago*, 2019 IL App (1st) 180771 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-L-1968; the Hon. Kathy Flanagan, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert A. Langendorf, of Robert A. Langendorf, P.C., of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Edward N. Siskel, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Sara K. Hornstra, Assistant Corporation Counsel, of counsel), for appellees. |

---