**2022 IL 127236**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127236)

JAVIER ROBINSON, Appellee, v. THE VILLAGE OF SAUK VILLAGE *et al.*, Appellants.

*Opinion filed April 21, 2022.*

JUSTICE CARTER delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Neville, Michael J. Burke, and Overstreet concurred in the judgment and opinion.

**OPINION**

¶ 1        Section 4-106(b) of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/4-106(b) (West 2016)) provides local public entities and public employees with absolute immunity from liability for "[a]ny injury inflicted by an escaped or escaping prisoner." In this case, the appellate court held that the defendants, several police officers and their

government employers, did not have immunity under section 4-106(b) for injuries suffered by the plaintiff, a pedestrian hit by a fleeing vehicle during a police chase, because the person the police officers were chasing was not "an escaped or escaping prisoner" within the meaning of the Tort Immunity Act. 2021 IL App (1st) 200223. For the reasons that follow, we affirm the appellate court's judgment.

¶ 2                                                   I. BACKGROUND

¶ 3        Plaintiff, Javier Robinson, filed a complaint against the defendants, the Village of Sauk Village, Sauk Village police officers Mark Bugajski and Andrew Vaughn, the Village of Crete, and Village of Crete police officers Allen Rinchich and Juan Garcia.[1] Plaintiff sought to recover for injuries he suffered when he was hit by a vehicle fleeing from the defendant police officers. Plaintiff alleged the police officers' conduct was willful and wanton and that the Villages were liable for their employees' actions under the doctrine of *respondeat superior*. Defendants filed motions for summary judgment asserting, in pertinent part, absolute immunity under section 4-106(b) of the Tort Immunity Act (745 ILCS 10/4-106(b) (West 2016)).

¶ 4        The pleadings and evidentiary materials on file show that on August 10, 2017, at approximately 5 a.m., Officer Rinchich received a report that a black Buick LaCrosse had been stolen. He observed a vehicle matching that description and began following it. After confirming that the vehicle was reported stolen, Rinchich activated his emergency lights, and the Buick, driven by Mark Coffey,[2] began to speed up and flee. Village of Crete police officers Garcia and Hoernig eventually joined in the chase behind Rinchich. Coffey led the officers on a chase through multiple jurisdictions at speeds of up to 90 miles per hour. At times, the vehicles disregarded traffic signals and drove into oncoming traffic.

---

[1]Prior to oral argument, the plaintiff and defendants Village of Crete, Allen Rinchich, and Juan Garcia filed a joint motion to dismiss those defendants from this appeal, after they settled their portion of this case. The remaining defendants did not oppose the dismissal of the Village of Crete, Allen Rinchich, and Juan Garcia as parties to the appeal. Accordingly, we allowed the motion.

[2]In the record, the driver of the Buick is referred to as both Mark Coffey and Mark Coffee.

¶ 5        Coffey was pursued into Indiana, where he eventually came to a stop in a church parking lot in Dyer, Indiana. Before stopping, Coffey was approximately one-quarter mile ahead of the officers. When Officer Rinchich caught up, he entered the church parking lot and parked his squad car perpendicular to the driver's side of the Buick, with his headlights shining into the driver's side of the Buick. Rinchich got out of his squad car, drew his handgun, and repeatedly yelled "hands" at Coffey. When Officers Garcia and Hoernig arrived, Garcia parked next to Rinchich's squad car, with Hoernig parking behind them. Garcia and Hoernig also got out of their vehicles and drew their handguns.

¶ 6        During the chase, Sauk Village police officers Bugajski and Vaughan received radio dispatches about the pursuit, eventually notifying them that the Buick was heading toward the church parking lot in Dyer, Indiana. Officer Bugajski drove to that location and observed the three Village of Crete squad cars and Officers Rinchich, Garcia, and Hoernig with their weapons drawn and pointed at Coffey. Officer Garcia asserted that a total of six police vehicles were in the church parking lot and officers deployed various weapons, including an AR-15 assault rifle and a shotgun.

¶ 7        Officer Rinchich approached to within approximately 10 feet of Coffey. The dash camera video from Rinchich's squad car shows that he approached near the front of the Buick on the driver's side but after a couple seconds he backed away out of view of the camera. Coffey remained seated in the vehicle with the engine running and the door closed. Coffey ignored the officers' orders to exit the vehicle and repeatedly shouted, "shoot me." Coffey also pointed a bottle and then a small black object at Rinchich. Rinchich asserted that the black object looked like a gun.

¶ 8        A little over one minute after Rinchich arrived in the parking lot, Coffey drove away. Officers Rinchich, Garcia, and Hoernig again pursued while Officer Bugajski and Officer Vaughan monitored the chase, blocked off intersections, and joined the chase at times. During the chase, Coffey reentered Illinois with the vehicles traveling at speeds of up to 100 miles per hour. At times, Coffey disregarded traffic signals and continued to travel into oncoming traffic. The chase eventually proceeded into a residential neighborhood where Coffey stopped, got out of the Buick, got into a parked car, and drove away again.

¶ 9        Officers Vaughan, Hoernig, and Garcia attempted to pursue, and as Coffey sped through an intersection at approximately 5:17 a.m., he struck plaintiff, who was walking across the street in a crosswalk. Plaintiff suffered severe injuries. Officer Garcia's police report states that plaintiff was lying "in a pool of blood with blood coming from his head" and "each of his leg bones on both legs [were] protruding from the skin at mid shin." Plaintiff was taken to a hospital by ambulance. Coffey continued to flee and returned to Indiana, where he was shot and killed by Indiana police officers.

¶ 10       Based on the evidence, the Cook County circuit court granted defendants' motions for summary judgment, ruling that Coffey was in custody when the police officers pointed their weapons at him and ordered him to show his hands in the church parking lot. The circuit court determined that Coffey was an escaping prisoner after that point and that defendants had absolute immunity from liability for plaintiff's injuries under section 4-106(b) of the Tort Immunity Act (745 ILCS 10/4-106(b) (West 2016)).

¶ 11       The appellate court disagreed with the circuit court, holding that, at the time plaintiff was struck by the car, Coffey was not "an escaped or escaping prisoner" as required for absolute immunity under section 4-106(b) of the Tort Immunity Act. 2021 IL App (1st) 200223, ¶¶ 1, 22. The Tort Immunity Act defines a prisoner as " 'a person held in custody,' " but it does not define the term "custody." *Id.* ¶ 10 (quoting 745 ILCS 10/4-101 (West 2016)). Contrary to defendants' argument, the appellate court determined that a mere show of authority by police officers is not sufficient to establish physical custody. *Id.* ¶ 17. According to the appellate court, Coffey's freedom of movement was not directly controlled or limited by the officers, and the evidence did not establish, as a matter of law, that he was in physical custody before he fled the church parking lot. *Id.* ¶ 18. The appellate court concluded that defendants failed to meet their burden of establishing that Coffey was an escaped or escaping prisoner within the meaning of the Tort Immunity Act when he struck plaintiff. *Id.* ¶ 22. Accordingly, the appellate court reversed the circuit court's decision granting summary judgment in favor of defendants based on the immunity provided in section 4-106(b) of the Tort Immunity Act. *Id.* ¶¶ 35-36.

¶ 12     We allowed defendants' petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Oct. 1, 2020)). We also allowed the Illinois Trial Lawyers Association to file an *amicus curiae* brief (Ill. S. Ct. R. 345 (eff. Sept. 20, 2010)).

¶ 13                                    II. ANALYSIS

¶ 14     On appeal to this court, defendants contend that our decision in *Ries v. City of Chicago*, 242 Ill. 2d 205 (2011), and the appellate court's decision in *Townsend v. Anderson*, 2019 IL App (1st) 180771, support a conclusion that a show of authority by police officers is sufficient to establish custody within the meaning of section 4-106(b). In *Ries*, this court held that the Tort Immunity Act "does not require a formal arrest or imprisonment." *Ries*, 242 Ill. 2d at 216. Defendants maintain that Coffey's freedom of movement was sufficiently controlled and limited by multiple police officers, with guns drawn, shouting commands for Coffey to show his hands and get out of the vehicle. According to defendants, section 4-106(b) immunity applies in this case because the facts establish that Coffey was an "escaping prisoner" after he was confronted by multiple police officers with their guns drawn in the church parking lot.

¶ 15     Plaintiff responds that a show of authority alone is not enough to establish custody for the purpose of immunity under section 4-106(b). In *Ries*, this court defined "custody" to require an element of direct control over the suspect's freedom of movement. According to plaintiff, defendants did not control or limit Coffey's freedom of movement in any real way. They did not block his path, they never got closer than 10 to 15 feet away from him, and Coffey never complied with the officers' commands or submitted to their show of authority. Plaintiff maintains that, if a mere show of authority is sufficient to establish custody under section 4-106(b), the absolute immunity provided by that section may be invoked any time a police officer tells a person to stop or turns on a squad car's lights and siren. Plaintiff concludes that the absolute immunity under section 4-106(b) was not intended to apply to the circumstances presented here.

¶ 16     In this case, the circuit court granted summary judgment in favor of defendants. Under section 2-1005(c) of the Code of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). We review orders granting summary judgment *de novo*. *State Farm Mutual Automobile Insurance Co. v. Elmore*, 2020 IL 125441, ¶ 19.

¶ 17        This appeal presents a question of statutory construction. The construction of a statute is also subject to *de novo* review. *Palos Community Hospital v. Humana Insurance Co.*, 2021 IL 126008, ¶ 24. The fundamental goal of statutory construction is to ascertain and give effect to the intent of the legislature. *In re Marriage of Dynako*, 2021 IL 126835, ¶ 14. The best evidence of legislative intent is the language used in the statute, given its plain and ordinary meaning. *Haage v. Zavala*, 2021 IL 125918, ¶ 44. In construing a statute, the court may also consider the reason or purpose for the law, the problems it seeks to address, and the consequences of construing the statute one way or another. *Id.*

¶ 18        Section 4-106(b) of the Tort Immunity Act provides that "[n]either a local public entity nor a public employee is liable for *** [a]ny injury inflicted by an escaped or escaping prisoner." 745 ILCS 10/4-106(b) (West 2016). The Act further states that "[a]s used in this Article, 'prisoner' means a person held in custody." *Id.* § 4-101.

¶ 19        As noted by the parties, we previously construed and applied section 4-106(b) in *Ries*, 242 Ill. 2d 205. In that case, Chicago police officer Sergio Oliva noticed several people standing around a young man. One of the people signaled to Oliva and told him that the man had tried to flee the scene of a traffic accident. Oliva placed the man, Demario Lowe, in the back of his squad car without handcuffing him or turning off the engine. The squad car did not have a cage or screen preventing access to the front seat, and Oliva soon saw Lowe driving away. Two other police officers pursued, and Lowe ultimately hit several parked vehicles, drove through a red light at a high rate of speed, and collided with the plaintiffs' vehicle, which was stopped at an intersection waiting to make a left turn. The plaintiffs suffered multiple injuries in the collision. *Id.* at 208.

¶ 20        The plaintiffs sued Oliva and the City of Chicago (City), alleging that Oliva's conduct, undertaken while he was acting on behalf of the City, was willful and wanton. The plaintiffs subsequently filed a first amended complaint, adding claims that the two officers who pursued Lowe failed to terminate the pursuit when the

danger to the general public outweighed the benefit of apprehending Lowe. The first amended complaint further alleged that the City engaged in willful and wanton misconduct through the pursuing officers. *Id.* at 208-09. A jury returned verdicts for the plaintiffs. *Id.* at 211. The appellate court reversed, holding, in pertinent part, that the City was immune from liability under section 4-106(b) (745 ILCS 10/4-106(b) (West 2008)) because Lowe was an escaping prisoner when he collided with the plaintiffs' vehicle. *Ries*, 242 Ill. 2d at 211-13.

¶ 21    On review, this court agreed that the City was immune from liability under section 4-106(b). *Id.* at 215. In construing section 4-106(b), we began by noting that "[t]he Act does not require a formal arrest or imprisonment, but rather defines 'prisoner' as 'a person held in custody.' " *Id.* at 216 (quoting 745 ILCS 10/4-101 (West 2008)). The Tort Immunity Act does not define the term "custody." This court, therefore, reviewed definitions of that term from Black's Law Dictionary, including one from an earlier edition stating that " " 'The term [custody] is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession." ' " *Id.* at 216 (quoting *People v. Campa*, 217 Ill. 2d 243, 254 (2005), quoting Black's Law Dictionary 347 (5th ed. 1979)). We emphasized the elasticity of the term "custody" by reviewing its meaning in various contexts, including under the speedy-trial statute, when a person fails to return for an independent day release program, and in the context of custodial interrogation triggering the requirement for *Miranda* warnings. *Id.* at 216-17; see also *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 22    After reviewing those various definitions of the term "custody," this court concluded that Lowe was clearly an escaping prisoner within the meaning of the Tort Immunity Act. *Ries*, 242 Ill. 2d at 217. This court explained,

"If the legislature had meant the term 'custody' to be so restrictive as to include only imprisonment, the legislature almost certainly would have used the term 'imprisonment' instead. For purposes of this case, it is not necessary to determine how broad the term 'custody' may be, as it is certainly broad enough to include situations such as this. Here, Oliva arrived at the scene of a traffic accident and was told that Lowe had caused the accident and was attempting to flee the scene. Oliva then placed Lowe in the back of his squad car. Lowe was in custody at this point. He was being detained, and his freedom of movement

- 7 -

had been directly controlled and limited by Oliva's lawful authority. Moreover, a reasonable person placed in the back of a squad car by a police officer would not feel free to leave." *Id.*

¶ 23 This court repeated that Lowe was being held in custody "given that [he] was placed in the back of a squad car by a police officer who had been told that Lowe was trying to flee the scene of an accident that he had caused." *Id.* at 218. We, therefore, concluded that the City had absolute immunity under section 4-106(b) because Lowe was an escaping prisoner as defined by the statute when he crashed into the plaintiffs' vehicle and caused their injuries. *Id.* at 218-19.

¶ 24 We note that, in the analysis in *Ries*, this court mentioned whether a reasonable person would feel free to leave. *Id.* at 217. Our emphasis, however, was on Oliva's direct control and limitation of Lowe's freedom of movement. In determining that section 4-106(b) applied to the facts in *Ries*, this court focused on Oliva's act of placing Lowe in the back seat of the squad car, stating "Lowe was in custody at this point." *Id.*

¶ 25 The plain language of the Tort Immunity Act supports the emphasis in *Ries* on direct control and limitation of a suspect's freedom of movement in determining whether the suspect is an "escaped or escaping prisoner." In defining the term "prisoner," the Tort Immunity Act does not simply refer to "custody." Rather, the Tort Immunity Act defines a "prisoner" as a person "*held in* custody." (Emphasis added.) 745 ILCS 10/4-101 (West 2016). Relevant to this context, the term "hold" is defined as "to prevent from leaving or getting away" or "to maintain position." Merriam-Webster's Collegiate Dictionary 552 (10th ed. 1999). Thus, the phrase "held in custody" plainly requires some direct restriction or control of a person's freedom of movement to a particular place for at least a limited period of time.

¶ 26 The broader structure of the Tort Immunity Act also supports our construction of the term "custody" in *Ries*. In section 4-101, the legislature used the word "custody" to define the term "prisoner." 745 ILCS 10/4-101 (West 2016). Thus, "custody" must be understood in that context. The word "prisoner" plainly refers to a person subject to some level of physical confinement. See, *e.g.*, Black's Law Dictionary 1447 (11th Ed. 2019) (defining "prisoner" alternatively as "[s]omeone who is being confined in prison," "[s]omeone who has been apprehended by a law-enforcement officer and is in custody," and "[s]omeone who is taken by force and

kept somewhere"). The Tort Immunity Act also contains other references to the term "prisoner" that convey the same basic meaning of physical confinement. See 745 ILCS 10/4-103 (West 2016) (granting immunity for failure to provide jails or correctional facilities and stating that "[n]othing in this Section requires the periodic inspection of prisoners"); *id.* § 4-104 (providing immunity for "interfering with the right of a prisoner to obtain a judicial determination or review of the legality of his confinement"); *id.* § 4-105 (stating that "[n]either a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to obtain medical care for a prisoner in his custody"). Thus, our construction of the term "custody" to require direct restriction or control of a person's freedom of movement is further supported by the structure and context provided in the Tort Immunity Act.

¶ 27    In this case, several police officers parked their squad cars perpendicular to the driver's side of the stopped Buick. Officer Rinchich got out of his squad car, drew his handgun, approached to within approximately 10 feet of Coffey, and yelled "hands" at him. As many as six police vehicles were in the parking lot, with several officers pointing weapons at Coffey. Coffey remained in the vehicle with the engine running and the door closed, however. A little over one minute after Rinchich arrived in the parking lot, Coffey drove away and continued to lead the officers on a police chase.

¶ 28    While the officers attempted to restrain or control Coffey's freedom of movement, the record shows that they did not achieve that objective. The officers did not block Coffey's path with their squad cars or otherwise directly limit or control his freedom of movement. Rather, he was free to drive out of the church parking lot with no physical impediment. Unlike in *Ries*, the officers did not directly control or limit Coffey's freedom of movement to a particular place.

¶ 29    Relying heavily on *Townsend*, 2019 IL App (1st) 180771, defendants, nonetheless, argue that Coffey was in custody within the meaning of the Tort Immunity Act when he was confronted by several police officers with weapons drawn in the church parking lot. Defendants maintain that Coffey's freedom of movement was controlled by the police officers' show of authority and that *Townsend* "would compel a finding" that Coffey was in custody for purposes of the Tort Immunity Act.

¶ 30    In *Townsend*, two Chicago police officers stopped a car for operating at dusk without its headlights illuminated. The officers approached on opposite sides of the vehicle. The driver was ordered out of the vehicle and handcuffed when he was unable to produce a driver's license. The other police officer ordered the front seat passenger out of the car and began handcuffing him after observing him make furtive movements toward the floor and the presence of an open container of alcohol near him. At that point, one of the rear seat passengers, Ricky Anderson, jumped into the driver's seat, put the car in gear, and tried to take off while the officer on the driver's side "was grabbing at him." Anderson responded by saying "something *** like [']why are you grabbing me.['] " Anderson avoided the officer's attempts to grab him and drove off. *Id.* ¶ 6. Several minutes later, Anderson struck another car, injuring the plaintiff. *Id.* ¶ 7.

¶ 31    The plaintiff sued the City of Chicago and several police officers, alleging willful and wanton misconduct. The plaintiff claimed that officers engaged in an unsafe pursuit of Anderson and that the City was responsible for the conduct of its employees. *Id.* ¶ 4. The circuit court granted the defendants' motion for summary judgment, ruling that they were immune from liability under section 4-106(b) of the Tort Immunity Act because Anderson was an "escaping prisoner" at the time he crashed into the car and caused the plaintiff's injuries. *Id.* ¶ 18.

¶ 32    The appellate court agreed with the circuit court that section 4-106(b) applied, asserting that the police officers "took positions on both sides of the vehicle," "effectively curtail[ing] Anderson's and the other three occupants' freedom of movement." *Id.* ¶ 31. The appellate court noted that, during a traffic stop, police officers exercise control over all occupants of a vehicle. *Id.* ¶ 32 (citing *Brendlin v. California*, 551 U.S. 249, 255 (2007) (stating that "during a traffic stop an officer seizes everyone in the vehicle, not just the driver")). Further, a reasonable person in Anderson's position would not have felt free to leave, given that he was a passenger subjected to a traffic stop and both the driver and the front seat passenger had been handcuffed. *Id.* The appellate court concluded that Anderson was in custody within the meaning of section 4-106(b) when he fled the scene of the ongoing traffic stop. *Id.* ¶ 34. Accordingly, the defendants were immune from liability because the plaintiff's injuries were caused by an escaping prisoner. *Id.*

¶ 33 We disagree with the appellate court's decision in *Townsend*. As we have explained, section 4-106(b) immunity applies only when the circumstances of the case show officers have directly controlled and limited a person's freedom of movement to a particular place.

¶ 34 In *Townsend*, the officers never directly controlled or limited Anderson's freedom of movement during the traffic stop. The acts of stopping the vehicle with Anderson in the back seat and approaching the car on either side did not amount to holding Anderson in custody within the meaning of the Tort Immunity Act. While one of the officers attempted to grab Anderson as he drove away, the officer was not able to control or restrain his freedom of movement.

¶ 35 The facts of *Townsend* fall short of establishing direct control or restraint of Anderson's freedom of movement. The officers were close to Anderson, and they attempted to restrain him, but they did not hold him in custody within the meaning of section 4-106(b) before he drove away and collided with another car, injuring the plaintiff. We hold that the appellate court erred in finding section 4-106(b) immunity applied to the facts in *Townsend*. Accordingly, the appellate court's decision in *Townsend* must be overruled.

¶ 36 Similar to *Townsend*, Coffey's freedom of movement was never directly limited or controlled by the police officers in this case. The officers exited their vehicles, pointed their weapons at Coffey, and ordered him out of the car, but Coffey's freedom of movement was never directly controlled or limited to a particular place. The officers did not block Coffey's exit with their squad cars or otherwise control his freedom of movement. After being confronted by the police officers, Coffey simply drove out of the church parking lot and continued to lead the officers on a chase.

¶ 37 We agree with the appellate court that a mere show of authority is not sufficient to establish that a person is "held in custody" under the Tort Immunity Act. 2021 IL App (1st) 200223, ¶ 17. Allowing a show of authority, by itself, to establish that a person is "held in custody" would expand the absolute immunity provided by section 4-106(b) beyond its intended application. For instance, a police officer's simple act of turning on a squad car's lights or siren to initiate a traffic stop could certainly be considered a show of authority, but the legislature could not have intended that sort of action, by itself, to trigger the absolute immunity provided by

section 4-106(b). By its plain language, section 4-106(b) is applicable only when injuries are inflicted by an "escaped or escaping prisoner." 745 ILCS 10/4-106(b) (West 2016).

¶ 38    In sum, we conclude that the plain language of the Tort Immunity Act requires a showing that police officers directly limited or controlled a person's freedom of movement to a particular place to trigger the absolute immunity provided in section 4-106(b). Until that occurs, a person is not an "escaped or escaping prisoner" within the plain language of the Tort Immunity Act.

¶ 39    Applying the statutory standard to this case, we cannot say that Coffey's freedom of movement was directly controlled or limited to a particular place. Coffey was not "held in custody" in the church parking lot within the plain and ordinary meaning of that phrase, and consequently, he was not an "escaped or escaping prisoner" when he subsequently hit plaintiff as he was crossing the street. Accordingly, defendants do not have absolute immunity from liability for plaintiff's injuries under section 4-106(b) of the Tort Immunity Act. We agree with the appellate court that the circuit court erred in granting defendants' motion for summary judgment based on the application of section 4-106(b).

¶ 40                                  III. CONCLUSION

¶ 41    For the reasons stated above, we affirm the appellate court's judgment, and we remand to the circuit court for further proceedings.

¶ 42    Appellate court judgment affirmed.

¶ 43    Circuit court judgment reversed.

¶ 44    Cause remanded.