**2022 IL 127681**


# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127681)

THE PEOPLE OF THE STATE OF ILLINOIS v. RICHARD KASTMAN,
Appellee (Rob Jeffreys, Director of Corrections, Appellant).


*Opinion filed September 22, 2022.*


JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Theis, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

Justice Holder White took no part in the decision.


**OPINION**

¶ 1    In 1994, defendant Richard Kastman was found to be a sexually dangerous person and was committed to the guardianship and custody of the director of the Department of Corrections (Department) under the Sexually Dangerous Persons Act (Act) (725 ILCS 205/0.01 *et seq.* (West 1994)). Kastman was granted

conditional release from institutional care and subsequently filed a petition requesting that the director of the Department be compelled to provide financial assistance to cover his treatment costs and living expenses. Rob Jeffreys, the Director of Corrections (Director), intervened and opposed Kastman's petition. The circuit court of Lake County granted the petition and ordered the Director to pay a portion of Kastman's monthly expenses. The Director filed an interlocutory appeal (Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017)), and the appellate court affirmed. 2021 IL App (2d) 210158. This court allowed the Director's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2019). For the following reasons, we affirm the judgment of the appellate court.

¶ 2                                    I. BACKGROUND

¶ 3                        A. Underlying Commitment and Conditional
                                   Release Proceedings

¶ 4        In 1993, Kastman was charged with misdemeanor offenses based on acts of public indecency involving children and disorderly conduct. In lieu of pursuing a criminal prosecution, the state's attorney for Lake County initiated a civil commitment proceeding against Kastman under the Act (725 ILCS 205/0.01 *et seq.* (West 1992)). Evidence presented during that proceeding indicated that Kastman suffered from pedophilia, antisocial personality disorder, exhibitionism, and alcohol dependency. Kastman was found to be a sexually dangerous person, and the circuit court granted the State's petition for civil commitment. As a result, Kastman was committed to the Director's guardianship and placed, by the Director, in the sexually dangerous persons program at Big Muddy River Correctional Center (Big Muddy), an institutional facility operated by the Department.

¶ 5        While he was confined at Big Muddy, Kastman filed several recovery applications seeking his release or for review of his treatment. His most recent application for conditional release was filed in 2013. The application was supported by the evaluation of Dr. Mark Carich, who determined that Kastman appeared to be no longer dangerous within the confines of an institution. In addition, Dr. Kristopher Clounch evaluated Kastman and supported his request for conditional release. Based on the opinions of these two evaluators, the State did not contest

- 2 -

Kastman's application, and the parties submitted an agreed order of conditional release, which was approved and entered by the circuit court on January 11, 2016.

¶ 6    The conditional release order permitted Kastman to reside outside of the institutional setting and imposed numerous restrictions on his conduct. Among other restrictions, the order (1) mandated that Kastman comply with all applicable requirements of the Sex Offender Registration Act (SORA) (730 ILCS 150/1 *et seq.* (2016)); (2) placed him under the supervision of a Department parole agent and a county probation officer; (3) directed that, after being released from Big Muddy and transferred to the Lake County Community Based Correctional Center (CBCC), he was to seek a residence with the advice and consent of his parole agent and probation officer; (4) prohibited him from changing his living arrangement or residence without court approval and provided that, if he was evicted, he must be returned to the CBCC; (5) set numerous limits on his freedom of movement, which was monitored by a global positioning system (GPS) device; (6) subjected him, his residence, and his personal property to suspicionless and warrantless search upon request by any law enforcement, probation, or parole officer; (7) directed him to refrain from possession or consumption of drugs or alcohol; (8) mandated that he engage in treatment for substance abuse, sexual offending, and any other treatment directed by his parole agent or probation officer and waive all confidentiality to records of such treatment; (9) limited his ability to form or maintain a variety of social contacts; and (10) prohibited his use of the Internet.

¶ 7    The conditional release order further mandated that Kastman become self-supporting by obtaining employment, at least part-time, at a job and site approved by the parole and probation departments or by performing voluntary public service work at an approved site while receiving Social Security (SSI) disability benefits. The order also required that he pay all monthly living expenses and comply with the parole and probation departments in developing a budget. In addition, the order directed that, during periods of unemployment, Kastman was to actively seek employment or pursue an approved course of study or vocational training.

¶ 8    The conditional release order further provided that the Department's sex offender treatment staff at Big Muddy were to have consultation with the parole and probation departments and the community treatment personnel concerning Kastman's progress, including access to all treatment-related reports and

information. The order also stated that all of the conditions set forth therein were subject to periodic review and may be modified by the committing court upon motion of either party. Pursuant to this modification clause, the court subsequently amended the order to require that Kastman be placed on a continuous alcohol monitoring device (SCRAM bracelet) to ensure that he did not consume alcohol.

¶ 9                         B. Kastman's Request for Financial Assistance
                                        From the Director

¶ 10      In December 2020, approximately five years after he was placed on conditional release, Kastman filed a motion seeking further modification of that order. In particular, he requested that the circuit court order the Director, as his guardian, to provide financial assistance to cover certain of his living expenses and mandated treatment costs. Kastman's motion asserted that he was unemployed, disabled, and could not afford his $300 monthly treatment costs and the $1800 monthly rent for housing that complied with SORA.

¶ 11      The Director was granted leave to intervene and opposed Kastman's motion, asserting that he was not financially responsible for Kastman because the conditional release order provided that Kastman would become self-supporting and would pay for his own monthly expenses. The Director further asserted that he had no continuing duty to provide for Kastman's housing and treatment because Kastman was no longer confined in an institutional setting.

¶ 12      At hearings conducted on February 17 and March 3, 2021, the court was advised of information as to Kastman's financial situation, which reflected that he had been paying for all of his essential living and treatment expenses for the previous five years but had depleted much of his accumulated funds. As of March 3, 2021, Kastman had approximately $9000 remaining in his checking account and a monthly disability income of $1130. His monthly expenses, necessitated by the conditional release order, totaled $2912. Kastman argued that, without financial assistance, he would exhaust all of his savings in approximately five months and then could not afford to comply with the terms of the conditional release order.

¶ 13                              C. Circuit Court Decision

¶ 14        The circuit court granted Kastman's motion and entered a modified order that
cited the Director's duty to provide for Kastman's "care and treatment while he's
*** outside the institutional setting." The circuit court ordered the Director to
contribute $2412 per month toward Kastman's essential expenses, including rent,
sex offender treatment, utilities, and medical copayments. The modified order also
required Kastman to pay $500 toward his monthly living expenses. In entering that
order, the circuit court commented that "[o]ne has to look at the big picture and
make a determination as to how anyone can move forward from being actually
confined at Big Muddy." The circuit court observed, "I don't think it's incumbent
on [Kastman] draining the money he has in the account until it drains completely."
The court also stated, "[i]t's the Court's hope that as he goes forward, [Kastman]
will be in a better position to take on more of the responsibilities with regard to
pulling his weight financially in the outside placement."


¶ 15                              D. Appellate Court Decision

¶ 16        The Director filed an interlocutory appeal of the circuit court's order pursuant
to Illinois Supreme Court Rule 307(a) (eff. Nov. 1, 2017). The appellate court
affirmed, holding that the statutory duties of the Director obligate him to provide
care and treatment of a sexually dangerous person and to keep such a person safe
until that person has recovered and is released. 2021 IL App (2d) 210158, ¶¶ 17-
22. The appellate court reasoned that a sexually dangerous person who has been
conditionally released is not considered to have recovered and has not been
discharged. *Id.* ¶ 17. Based on that circumstance, the appellate court concluded that
the Director remains the guardian of a conditionally released sexually dangerous
person and is obligated to provide care and treatment that is designed to effect his
ward's recovery and to keep his ward safe. *Id.*

¶ 17        The appellate court observed that its conclusion was consistent with this court's
decision in *People v. Cooper*, 132 Ill. 2d 347 (1989), which held that a circuit court
retains jurisdiction over a sexually dangerous person on conditional release. 2021
IL App (2d) 210158, ¶ 18 (citing *Cooper*, 132 Ill. 2d at 354-55). The appellate court
also noted that *Cooper* differentiated an order granting conditional release from an
order that discharges a sexually dangerous person from the supervision of the

- 5 -

Director and the jurisdiction of the committing court. *Id.* According to the appellate court, this distinction reflects that the Director's guardianship extends to sexually dangerous persons on conditional release. *Id.*

¶ 18    In addition, the appellate court further observed that an order granting conditional release is one of the statutory procedures in the Act that are designed to aid a sexually dangerous person's recovery. *Id.* ¶ 19. Accordingly, the appellate court reasoned that a conditional release order does not negate the Director's obligation to provide care and treatment to committed persons and it does not deprive the circuit court of jurisdiction to review the adequacy of that care and treatment or to modify the terms of the conditional release. *Id.*

¶ 19    The appellate court rejected the Director's argument that the circuit court erred because the Act does not include any language expressly requiring him to provide financial assistance to a sexually dangerous person on conditional release. *Id.* ¶ 20. In doing so, the court recognized that the Act frequently uses the term "guardian" to describe the Director's relationship to his ward and also mandates that the Director provide care and treatment for his wards without otherwise limiting his guardianship role. *Id.*

¶ 20    The court further observed that Illinois reviewing courts previously have held that the Director may be required to pay for a sexually dangerous person's necessary expenses. *Id.* (citing *People v. Carter*, 392 Ill. App. 3d 520, 525-26 (2009), *People v. Downs*, 371 Ill. App. 3d 1187, 1189-91 (2007), and *People v. Wilcoxen*, 358 Ill. App. 3d 1076, 1078-79 (2005)).

¶ 21    The appellate court observed that the necessary expenses of Kastman's conditional release appear to be less expensive than the cost of his confinement. *Id.* ¶ 21. The appellate court further noted that, without financial assistance from the Director, Kastman could "blamelessly" violate the conditions of his release and be recommitted because of his "inability to pay." *Id.* ¶ 22. The appellate court concluded that the circuit court had authority to order the Director to provide financial assistance to Kastman while on conditional release and that the circuit court's order was appropriately tailored to the circumstances. *Id.* ¶ 24. The Director then filed a petition for leave to appeal to this court.

¶ 22                          E. Subsequent Proceedings

¶ 23        After the Director filed his petition, Kastman was arrested and charged with new sex offenses involving masturbation and lewd exposure in the presence of minors. Based on those charges, the Attorney General, on behalf of the People, sought to revoke his conditional release (725 ILCS 205/9(e) (West 2018)), claiming that he had violated the term of his conditional release prohibiting him from committing new crimes. The criminal case and the revocation proceedings were consolidated. Thereafter, the parties entered into a plea agreement whereby Kastman entered a guilty plea and agreed to a sentence of 36 months' incarceration to be served at 50%. In exchange, the People agreed to withdraw the petition to revoke his conditional release and not revoke his conditional release based on any conduct related to the new criminal charges. The circuit court subsequently entered an agreed order temporarily staying the Director's duty to pay a portion of Kastman's living expenses under the March 3, 2021, order until Kastman completes his period of incarceration. According to its terms, that stay will be lifted automatically when the Director is notified that Kastman is no longer incarcerated.

¶ 24                                  II. ANALYSIS

¶ 25        At the outset, we note that the Director has not challenged the amount of financial assistance ordered by the circuit court, nor has he disputed its determination of Kastman's financial resources or the calculation of his living expenses and treatment costs. Rather, the Director's arguments are focused on the authority of the circuit court to enter such an order at all. Thus, the sole question presented for our review is whether the circuit court had authority, under the Act, to require the Director to contribute to the treatment costs and living expenses of Kastman after he had been placed on conditional release.[1]

---

[1]Kastman's incarceration and the temporary stay of the March 3, 2021, order have not rendered this appeal moot. Pursuant to an agreed order, the petition to revoke Kastman's conditional release was withdrawn, and the temporary stay of the March 3, 2021, order will be lifted upon his release from prison. At that time, the Director's obligation to pay a portion of Kastman's treatment costs and living expenses will resume. Therefore, this court's resolution of the issue presented will afford effectual relief. See *Balmoral Racing Club, Inc. v. Illinois Racing Board*, 151 Ill. 2d 367, 387 (1992)

¶ 26      The Director argues that the circuit court lacked that authority because the plain language of the Act does not require him to provide such financial assistance. According to the Director, his statutory duties to "keep safely" and to provide care and treatment to sexually dangerous persons does not extend to individuals on conditional release because they are not committed to his custody. The Director also maintains that the policies underlying the legislature's adoption of the Act indicate that those duties terminate when a sexually dangerous person is placed on conditional release.

¶ 27      Kastman responds that the circuit court had authority to order the Director to contribute to his essential living expenses because the conditional release order did not terminate his civil commitment or the Director's guardianship. In Kastman's view, the circuit court properly considered his financial inability to cover his treatment costs and living expenses mandated by the conditional release order because depriving a sexually dangerous person of conditional release solely on the basis of his indigency is inconsistent with the purposes of the Act.

¶ 28                    A. Principles of Statutory Construction

¶ 29      The determination of the scope of the circuit court's authority under the Act requires us to construe various sections of the Act. Statutory construction presents a pure question of law that we review *de novo*. *Robinson v. Village of Sauk Village*, 2022 IL 127236, ¶ 17. In doing so, we employ a familiar analytical framework.

¶ 30      The primary objective in construing a statute is to ascertain and give effect to the intention of the legislature. *Id.* The most reliable indicator of legislative intent is the language of the statute, which must be given its plain and ordinary meaning. *Id.* A statute is viewed as a whole. *Roberts v. Alexandria Transportation, Inc.*, 2021 IL 126249, ¶ 28. Therefore, words and phrases are construed in light of other relevant statutory provisions and not in isolation. *Id.*; *United States v. Glispie*, 2020 IL 125483, ¶ 10. Each word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous. *Roberts*, 2021 IL 126249, ¶ 29. A court may also consider the reason for the law, the

_____

(recognizing that an appeal is not moot when the rights and duties of the parties will be directly affected by the court's decision).

problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *Robinson*, 2022 IL 127236, ¶ 17; *Roberts*, 2021 IL 126249, ¶ 29; *Glispie*, 2020 IL 125483, ¶ 10. The court presumes that the General Assembly, in enacting legislation, did not intend absurdity, inconvenience, or injustice. *Roberts*, 2021 IL 126249, ¶ 29.

¶ 31                    B. General Statutory Overview

¶ 32        The Act, which was first adopted in 1938, established a statutory scheme for the civil commitment of persons who suffer from a mental disorder related to the commission of sex offenses. 725 ILCS 205/0.01 *et seq.* (West 2018); see Ill. Rev. Stat. 1939, ch. 38, ¶¶ 820 to 825. As defined in the Act,

> "sexually dangerous persons" include "[a]ll persons suffering from a mental disorder, which *** has existed for a period of not less than one year, *** coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children." 725 ILCS 205/1.01 (West 2018).

¶ 33        The Act is composed of two separate but interrelated proceedings. *People v. Trainor*, 196 Ill. 2d 318, 326 (2001); see also *People v. Olmstead*, 32 Ill. 2d 306, 313 (1965). The first part involves the commitment proceeding, during which the individual is adjudicated to be sexually dangerous and committed to the custody of the Director. *Trainor*, 196 Ill. 2d at 326. The order of commitment is for an indeterminate period of time until the sexually dangerous person has recovered and is released under the Act. *Id.* at 329. The second part is the recovery proceeding, during which a sexually dangerous person may file an application for recovery. *Id.* at 330. Both the commitment and recovery proceedings involve the " 'paramount factual issue of the mental condition of the defendant; both involve his liberty.' " *Id.* (quoting *Olmstead*, 32 Ill. 2d at 313). The first proceeding deprives the person of his liberty, and the second gives the person a chance to regain his freedom. *Id.*

¶ 34        Jurisdiction over proceedings brought pursuant to the Act is vested in the circuit courts. 725 ILCS 205/2 (West 2018). Such proceedings, which may be initiated by the attorney general or the state's attorney, are civil in nature and are brought in lieu of a criminal prosecution. *Id.* §§ 3, 3.01; see also *People v. Masterson*, 2011 IL

110072, ¶¶ 27, 29; *Trainor*, 196 Ill. 2d at 326-27. However, the burden of proof required to commit an individual as a sexually dangerous person is proof beyond a reasonable doubt. 725 ILCS 205/3.01 (West 2018). In addition, because a deprivation of liberty may result from such proceedings, a person subject to the Act has the right to demand a trial by jury and to be represented by counsel. *Id.* § 5. If that person is indigent, the cost of representation shall be paid by the county in which the proceeding is brought. *Id.*

¶ 35    As a whole, the Act serves the dual purposes of treatment for those found to be sexually dangerous and protection of the public. *Cooper*, 132 Ill. 2d at 355; see also *Trainor*, 196 Ill. 2d at 323-24. With regard to the first of these purposes, the Act promotes the goal of rehabilitative treatment and recovery of the offender rather than punishment. *Trainor*, 196 Ill. 2d at 323-24; *Cooper*, 132 Ill. 2d at 355; see also *People v. Allen*, 107 Ill. 2d 91, 100-02 (1985), *aff'd*, 478 U.S. 364, 368-70, 373 (1986).

¶ 36                          C. Specific Provisions at Issue

¶ 37    To determine whether a circuit court has statutory authority to require the Director to contribute financial assistance to a sexually dangerous person on conditional release, we examine sections 8, 9, and 10 of the Act. 725 ILCS 205/8, 9, 10 (West 2018).

¶ 38    Section 8 governs the commitment proceeding and provides, in relevant part, as follows:

"If the respondent is found to be a sexually dangerous person then the court shall appoint the Director of Corrections guardian of the person found to be sexually dangerous and such person shall stand committed to the custody of such guardian. The Director of Corrections as guardian shall keep safely the person so committed until the person has recovered and is released as hereinafter provided. The Director of Corrections as guardian shall provide care and treatment for the person committed to him designed to effect recovery. Any treatment provided under this Section shall be in conformance with the standards promulgated by the Sex Offender Management Board Act ***. The Director may place that ward in any facility in the Department of Corrections

or portion thereof set aside for the care and treatment of sexually dangerous persons. The Department of Corrections may also request another state Department or Agency to examine such person and upon such request, such Department or Agency shall make such examination and the Department of Corrections may, with the consent of the chief executive officer of such other Department or Agency, thereupon place such person in the care and treatment of such other Department or Agency." *Id.* § 8.

¶ 39    Section 9 sets forth the procedures and standards that govern the filing, hearing, and disposition of a recovery application by a sexually dangerous person. *Id.* § 9. Under section 9(e), if the person is found to be no longer dangerous, the court shall order that he or she be discharged, and every outstanding information and indictment that precipitated the commitment proceeding shall be quashed. *Id.* § 9(e).

¶ 40    Section 9(e) further provides that

"[i]f the court finds that the person appears no longer to be dangerous but that it is impossible to determine with certainty under conditions of institutional care that the person has fully recovered, the court shall enter an order permitting the person to go at large subject to the conditions and supervision by the Director as in the opinion of the court will adequately protect the public. In the event the person violates any of the conditions of the order, the court shall revoke the conditional release and recommit the person under Section 5-6-4 of the Unified Code of Corrections under the terms of the original commitment." *Id.*

¶ 41    Section 10 similarly provides for the filing of a petition for conditional release by the Director. *Id.* § 10. The Director may file such a petition whenever he finds that any person committed to him under the Act appears no longer to be dangerous but that it is impossible to determine with certainty under conditions of institutional care that such person has fully recovered. *Id.* As is true under section 9(e), the committing court may enter an order permitting such person to go at large subject to such conditions and such supervision by the Director as in the opinion of the court will adequately protect the public. *Id.* And if the person violates any of the conditions of such order, the court shall revoke such conditional release and recommit the person pursuant to section 5-6-4 of the Unified Code of Corrections (730 ILCS 5/5-6-4 (West 2018)) under the terms of the original commitment. 725

ILCS 205/10 (West 2018).

¶ 42                    D. Director's Duties Under the Plain Language of the Act

¶ 43        In support of his argument that the lower courts erred in ordering him to provide Kastman with financial assistance, the Director points out that the Act does not require that he contribute any economic support to sexually dangerous persons on conditional release. That is true. The Act is silent as to who should bear the economic burden of covering the treatment costs and living expenses of a sexually dangerous person on conditional release. Because the Act does not address any financial considerations, it does not expressly mandate the Director's contribution, nor does it prohibit such contribution. And it does not impose an economic qualification for persons who are eligible for conditional release.

¶ 44        Therefore, although the Act does not "require" financial assistance by the Director, that is not the question presented in this appeal. At issue is whether the terms of the Act afford the circuit court the authority and discretion to order that the Director provide such assistance.

¶ 45        The Director claims that the circuit court's order requiring him to provide financial assistance to Kastman while on conditional release is contrary to the plain language of the Act. In support, the Director relies on the terms of sections 8, 9(e), and 10 as indicating that the legislature precluded the circuit court from entering such an order. According to the Director, the terms of the Act mandate that he keep safely and provide care and treatment for only those sexually dangerous persons who are committed to his custody in an institutional setting and not those who are on conditional release. We disagree.

¶ 46        We initially consider the statutory duties imposed on the Director in section 8 of the Act. *Id.* § 8. Our reading of that provision reveals that it is composed of four essential and distinct components. First, section 8 provides that, once a person has been found to be sexually dangerous, the Director must be appointed as guardian and the sexually dangerous person "shall stand committed to the custody of such guardian." *Id.* Second, the duties imposed on the Director as guardian require him to (a) keep safely the person so committed until that person has recovered and is released and (b) provide care and treatment for the person committed to him

designed to effect recovery. *Id.* Third, section 8 generally prescribes the nature of the treatment that must be provided and identifies the permissible treatment providers. *Id.* Fourth, section 8 vests the Director with the responsibility to place the committed person (a) in an institutional facility (or portion thereof) operated by the Department that is set aside for the care and treatment of sexually dangerous persons or (b) in the care and treatment of another department or agency, provided the chief executive consents following an examination of the committed person. *Id.*

¶ 47 As previously noted, commitment under section 8 is for an indeterminate period. *People v. Burns*, 209 Ill. 2d 551, 553 (2004); *Trainor*, 196 Ill. 2d at 327, 329. And this court has held that the legal status of a sexually dangerous person who is committed under the Act does not change until a circuit court makes a current finding that the person is no longer dangerous and is entitled to discharge. *Cooper*, 132 Ill. 2d at 355-56. Accordingly, the Director's duties as guardian under section 8 arise from, and run parallel with, the sexually dangerous person's status. Thus, the Director's obligations to keep safely and to provide care and treatment are not restricted to a particular time period, and they are not extinguished until a court has found the sexually dangerous person to be recovered. Nothing in the language of section 8 limits the Director's duties to persons who are housed in an institutional facility, nor does that language indicate that he is relieved of those duties when a sexually dangerous person is placed on conditional release.

¶ 48                               E. Director's Plain Language Challenges

¶ 49                               1. "Committed to His Custody"

¶ 50 The Director challenges this reading of the plain language of the Act on several grounds. We address each in turn.

¶ 51 The Director argues that his duties under section 8 must terminate when a person is placed on conditional release because that person is not "committed to his custody." This assertion is unpersuasive.

¶ 52 In making this argument the Director equates the phrases "committed to his custody" and "so committed" with the concept of confinement in an institutional setting. According to the Director, a person who is "committed to his custody" must

- 13 -

be physically constrained and housed in an institutional setting that is under his control. Because the term "custody" is not defined in the Act, it is appropriate to consult dictionaries when seeking to ascertain its meaning. *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 32.

¶ 53      In the Director's view, the legal status of having been "so committed" under section 8 is inextricably linked to confinement. But these are not necessarily equivalent concepts. To be sure, when considered in certain contexts, the "custody" that is exercised by the Director or by the Department may refer to physical restraint and confinement in an institutional setting. See Black's Law Dictionary 483 (11th ed. 2019) (defining "penal custody" as "[c]ustody intended to punish a criminal offender"); *id.* at 1386 (defining "physical custody" as "[c]ustody of a person (such as an arrestee) whose freedom is directly controlled and limited"). But that is not always true. As this court has recognized, the meaning of the term "custody" is "very elastic and expansive and encompasses not only actual physical custody but also 'constructive' custody, which denotes control by legal authority." *People v. Clark*, 2019 IL 122891, ¶ 46; see also *People v. Beachem*, 229 Ill. 2d 237, 245 (2008). The phrase "constructive custody" refers to the " 'custody of a person (such as a parolee or probationer) whose freedom is controlled by legal authority but who is not under direct physical control.' " *Beachem*, 229 Ill. 2d at 245 (quoting Black's Law Dictionary 412 (8th ed. 2004)). Thus, the term "custody may encompass varying degrees of state control." *Id.*

¶ 54      Section 40(b)(5) of the Sexually Violent Persons Commitment Act provides that "[a]n order for conditional release places the person in the custody, care, and control of the Department." 725 ILCS 207/40(b)(5) (West 2018). In addition, section 3-14-2(a) of the Unified Code of Corrections provides that the Department "shall retain custody of all persons placed on parole or mandatory supervised release." 730 ILCS 5/3-14-2(a) (West 2018). Moreover, because the proceedings under the Act are civil in nature, the "custody" invested in the Director is that of a guardian. In that context, "custody" does not necessarily refer to confinement in an institutional setting. In fact, the primary definition of the word "custody" in Black's Law Dictionary is "[t]he care and control of a thing or person for inspection, preservation, or security." Black's Law Dictionary 483 (11th ed. 2019). This meaning of "custody" is consistent with the Director's statutory duties under

section 8 to keep safely a sexually dangerous person and to provide care and treatment that is designed to effect recovery.

¶ 55   There is no dispute that an order placing a person on conditional release is not the same as an order granting discharge, which requires a finding that the person is no longer dangerous. *Cooper*, 132 Ill. 2d at 354-55; see also *People v. Studdard*, 51 Ill. 2d 190, 194 (1972). As this court definitively stated in *Cooper*, when a court enters an order for conditional release, it has only concluded that, based on that person's conduct in an institutional setting, he no longer appears to be sexually dangerous. *Cooper*, 132 Ill. 2d at 354-55. That person retains the legal status of a sexually dangerous person until a circuit court makes a current finding that he is no longer sexually dangerous and grants a petition for discharge. *Id.* at 355-56, 358. In addition, section 8 expressly provides that the Director serves as guardian until the committed person "has recovered and is released." 725 ILCS 205/8 (West 2018).

¶ 56   Acceptance of the Director's position would mean that an individual on conditional release retains his legal status as a sexually dangerous person who has been "committed" under the Act but is *not* committed to the custody of the Director as guardian. There is nothing in the statutory language that expressly provides for such a situation, and the Director's argument fails to clarify what other person or entity would serve as guardian or how that approach would work as a practical matter.

¶ 57   The Director also relies on sections 9(e) and 10 as support for the contention that his duties under section 8 end when an order for conditional release is entered. But this assertion similarly finds no support in the language of those provisions.

¶ 58   Neither section 9(e) nor section 10 expressly states that the Director's section 8 duties are terminated when conditional release is granted. The primary circumstances that are affected by an order of conditional release are (1) where the sexually dangerous person resides, (2) the location and manner in which his treatment is provided, and (3) the nature and extent of the Director's supervision. As noted above, sections 9(e) and 10 provide that when a person committed under the Act

"appears no longer to be dangerous but that it is impossible to determine with certainty under conditions of institutional care that the person has fully

recovered, the court shall enter an order permitting the person to go at large subject to the conditions and supervision by the Director as in the opinion of the court will adequately protect the public." *Id.* § 9(e).

See also *id.* § 10.

¶ 59    Contrary to the Director's assertion, the language in sections 9(e) and 10 does not eliminate his section 8 duties, nor does it impose a new and distinct duty to supervise as the Director's sole responsibility. Rather, sections 9(e) and 10 define the contours of a circuit court's order for conditional release. Those provisions vest the circuit court with the responsibility to prescribe the type and manner of the Director's supervisory obligation that is encompassed within his duties to keep safely and to provide care and treatment. Because a person who is civilly committed under the Act has not been convicted and sentenced for a criminal offense, the obligation to supervise found in sections 9(e) and 10 necessarily stems from the Director's role as guardian and the duties imposed on him under section 8. When a sexually dangerous person is housed in an institutional setting, there is no need for the circuit court to specify the nature and level of supervision exercised by the Director—that supervision is absolute and comprehensive. However, when a sexually dangerous person is placed on conditional release, sections 9(e) and 10 vest the circuit court with the responsibility to articulate the type and extent of the Director's supervision while fulfilling his section 8 duties. It is *because* a sexually dangerous person remains committed to the custody of the Director, as guardian, that sections 9(e) and 10 require him to supervise that person outside of the institutional setting.

¶ 60    The Director further posits that conditional release terminates his duties as guardian because, unlike sexually dangerous persons who are confined in a state facility, those persons on conditional release are able to seek employment and otherwise may attend to their personal needs. True enough. But the fact that a person on conditional release may *seek* employment does not guarantee that he will find it or that such employment will provide sufficient compensation to cover all of his treatment costs and living expenses. Nothing in the Act indicates that the potential for gainful employment alone vitiates the Director's duties as guardian under section 8 or his ensuing obligation to supervise under sections 9(e) and 10.

¶ 61      Moreover, this court has recognized that conditional release is an aspect of the treatment of sexually dangerous persons who have been committed under the Act rather than being tried in a criminal prosecution. *Cooper*, 132 Ill. 2d at 357; see also *People v. Parrott*, 244 Ill. App. 3d 424, 431 (1993). Given that the purpose of the Act is rehabilitative—not punitive—conditional release is integral to the recovery process. And the receipt of continued treatment outside of the institutional setting is an essential component of conditional release. In light of these circumstances, it is clear that the legislature intended that the Director's duties to keep safely and to provide care and treatment to a sexually dangerous person endure while that person is on conditional release. The overall statutory scheme governing the commitment, recovery, and ultimate discharge of sexually dangerous persons permits no other interpretation.

¶ 62      The Director also relies on the fact that sections 9(e) and 10 indicate that a person who is on conditional release may "go at large," subject to the conditions set by the circuit court. 725 ILCS 205/9(e), 10 (West 2018). In the Director's view, inclusion of the phrase "at large" suggests that a person on conditional release is no longer committed to his custody. But, as noted above, the term "custody" does not necessarily require physical restraint and confinement in an institutional setting. Also, both sections 9(e) and 10 specifically provide that such a person remains under the supervision of the Director. Although a sexually dangerous person who is placed on conditional release is not physically confined in an institutional setting, that person remains committed under the Act and is subject to the supervision of the Director, as guardian, until he has recovered and is released.

¶ 63                              2. "Recommit"

¶ 64      The Director further points to language in sections 9(e) and 10 providing that the circuit court shall "recommit" a person who violates the terms of his conditional release. *Id.* According to the Director, if a person on conditional release remained committed to the Director's custody, the legislature would not have specified that he should be recommitted after violating the terms of his conditional release. We disagree.

¶ 65      The Director takes the term "recommit" out of context and, in doing so, distorts its significance in sections 9(e) and 10. The relevant language provides that, "[i]n

- 17 -

the event the person violates any of the conditions of the order, the court shall revoke the conditional release and recommit the person under Section 5-6-4 of the Unified Code of Corrections under the terms of the original commitment." *Id.* § 9(e); see also *id.* § 10. That sentence dictates two distinct procedural conditions. First, it requires that any proceeding to revoke a sexually dangerous person's conditional release must comply with the notice and hearing procedures in section 5-6-4 of the Unified Code of Corrections, which governs the revocation of parole or mandatory supervisory release of a criminal defendant. See 730 ILCS 5/5-6-4 (West 2018). Second, it dictates that the sexually dangerous person be recommitted "under the terms of the original commitment," which means the prior finding that the committed individual "appears" no longer to be dangerous has no effect. Accordingly, as was true at the time of the original commitment, the Director has the responsibility to decide on the placement of the sexually dangerous person in a facility that is operated by the Department or one that is operated by another department or agency. Upon entry of an order revoking the conditional release of a sexually dangerous person, the Director's responsibility to make that placement decision is revived. When that happens, the Director's section 8 duties to keep safely and to provide care and treatment must, again, be satisfied in an institutional setting. The use of the term "recommit" in sections 9(e) and 10 does not mean that those duties had been extinguished by entry of the conditional release order.

¶ 66                      3. "Recovered" and "Fully Recovered"

¶ 67      Next, the Director argues that sections 9(e) and 10 suggest that a sexually dangerous person on conditional release is "recovered" because those provisions permit entry of a conditional release order where it is impossible to determine that the person is "fully recovered." See 725 ILCS 205/9(e), 10 (West 2018). According to the Director, the use of the term "recovered" in section 8 and of the phrase "fully recovered" in sections 9(e) and 10 demonstrates the legislature's intent that his section 8 statutory duties would end at some stage before full recovery. We cannot agree.

¶ 68      The Director misconstrues the import of the legislature's inclusion of the modifier "fully" in the conditional release provisions. The phrase "fully recovered" in sections 9(e) and 10 is not intended to differentiate from the term "recovered" in

section 8. Rather, use of that phrase distinguishes from the *appearance* that a sexually dangerous person has recovered, where it is impossible to determine under the conditions of *institutional care* whether that is true.

¶ 69    Moreover, the Director concedes, as he must, that a person on conditional release retains his legal status as a sexually dangerous person. That means that a person on conditional release continues to suffer from "a mental disorder, which *** has existed for a period of not less than one year, *** coupled with criminal propensities to the commission of sex offenses." *Id.* § 1.01.

¶ 70    Although the process of recovery occurs on a spectrum that includes various stages, a sexually dangerous person is not "recovered" until he no longer suffers from the mental disorder identified in the Act. We construe the term "recovered" as used in section 8 to mean that the recovery process is complete—which is the same as "fully recovered."

¶ 71    In furtherance of his argument distinguishing the term "recovered" from "fully recovered," the Director asserts that a sexually dangerous person can be *both* recovered and on conditional release. He bases this assertion on the claim that the Act does not state that a person on conditional release is not recovered or that a person is only considered recovered when the court is satisfied that he is ready to be discharged from all supervision. This argument is entirely unpersuasive because it ignores other critical aspects of the Act.

¶ 72    Under section 9(e), a person who is found to be no longer dangerous is entitled to discharge. *Id.* § 9(e). And the condition of being no longer dangerous necessarily means that the person has "recovered." However, conditional release orders may be entered when a sexually dangerous person "*appears* no longer to be dangerous." (Emphasis added.) *Id.* §§ 9(e), 10. Such orders require that the sexually dangerous person be "subject to the conditions and supervision by the Director as in the opinion of the court will adequately protect the public." *Id.* § 9(e); see also *id.* § 10. Clearly, if the public needs protection, then the "appearance" of no longer being dangerous is not the same as being recovered. The Director has misconstrued the statutory language to suggest that a person on conditional release is recovered.

¶ 73    Thus, the Director's responsibilities as guardian remain in effect until the committed person "has recovered and is released." *Id.* § 8. Entry of an order for

discharge is permitted only when a court has found that the person is no longer dangerous. *Id.* § 9(e). Until a discharge order is entered, the Director is bound by his duties under section 8. In the absence of an order for conditional release, the Director must satisfy his duties "under conditions of institutional care." *Id.* §§ 9(e), 10. After a court has ordered conditional release, however, those duties must be satisfied outside the institutional setting.

¶ 74                                4. Unintended Financial Burden

¶ 75        The Director argues against this construction by claiming it will place a significant financial burden on the Department that does not appear in the Act's text. That is not the case. Construing sections 8, 9, and 10 together, and viewing the Act as an integrated whole, we conclude those statutory provisions demonstrate that the Director's statutory duties as guardian do not terminate upon the entry of a conditional release order. Therefore, the circuit court has authority and discretion to require that the Director contribute financial assistance to cover the treatment costs and living expenses of a sexually dangerous person on conditional release.

¶ 76        Of course, that does not mean that such an order is necessary or appropriate in every circumstance. Whether the circuit court *should* enter such an order is an entirely different question. In making that decision, circuit courts can find guidance in the Sexual Offender Management Board Act (Management Board Act) (20 ILCS 4026/1 *et seq.* (West 2018)), which is referenced in section 8 of the Act. The Management Board Act expressly applies to persons who have been found to be sexually dangerous under the Act. *Id.* § 10(b).

¶ 77        Section 17(a) of the Management Board Act requires that all persons who have been convicted and sentenced for a felony sex offense are required to undergo treatment as part of any sentence to probation, conditional release, or periodic imprisonment. *Id.* § 17(a). Section 17(b) of that statute provides that each sex offender who is placed on parole, aftercare release, or mandatory supervised release is similarly required to undergo treatment. *Id.* § 17(b). Both of these subsections mandate that the treatment shall be "at the offender's own expense based upon the offender's ability to pay for such treatment." *Id.* § 17(a); see also *id.* § 17(b) (same, with the exception of the word "own").

¶ 78     In addition, section 40(b)(6) of the Sexually Violent Persons Commitment Act provides that a person who is placed on conditional release and must undergo drug or alcohol testing or is subject to electronic monitoring may be ordered to pay all costs incident to those conditions "in accordance with the person's ability to pay those costs." 725 ILCS 207/40(b)(6) (West 2018).

¶ 79     These statutory provisions do not control here because Kastman has not been convicted and sentenced for a sex offense. However, these provisions reflect the legislature's understanding of the importance of treatment and testing when a sex offender is no longer confined. And they demonstrate the legislature's recognition that a sex offender's ability to pay for treatment is a relevant consideration in apportioning those costs. The ability to pay for housing should be considered in the same way.

¶ 80     Therefore, when confronted with a situation in which a sexually dangerous person on conditional release may be financially unstable, a circuit court can consider the extent to which that person is able to cover his treatment costs and living expenses. The court also may decide what portion of those expenses, if any, should be borne by the Director as guardian. Obviously, the Director can oppose a petition seeking his financial assistance—as he did in this case. In doing so, the Director may argue that the sexually dangerous person is able to shoulder those expenses based on his economic and employment circumstances. And, if those circumstances change for the better, the Director can seek to vacate or modify an order requiring him to contribute financial assistance.

¶ 81     Here, Kastman was on conditional release for almost five years. During that time, he paid for all of his treatment costs and living expenses before requesting that the conditional release order be modified to require the Director's financial assistance to cover the expenses that he could no longer afford. In granting that modification, the circuit court considered Kastman's ability to pay and ordered that he cover his expenses in the amount of $500 and that the Director pay the remainder.

¶ 82                           F. Director's Arguments Based on
                                 Nontextual Policy Considerations

¶ 83        The Director also posits several policy arguments to support his assertion that
our construction of the Act is inconsistent with the legislature's intent. Having
rejected that assertion based on the plain language, we need not address each of
these arguments. Policy-based concerns as to apportionment of necessary treatment
costs and living expenses under the Act are matters best addressed by the
legislature. See generally *Folta v. Ferro Engineering*, 2015 IL 118070, ¶ 43
(recognizing that it is the province of the legislature to decide the appropriate
balance when ascribing rights and duties in legislative provisions). We will,
however, consider some of those claims to dispel the Director's suggestion that our
interpretation is inconsistent with the purposes and goals of the Act or does violence
to other aspects of Illinois law.

¶ 84        Initially, the Director contends that requiring him to provide financial assistance
to sexually dangerous persons on conditional release could have unintended
consequences because certain other statutes require the Department to supervise
individuals outside of an institutional setting. According to the Director, if the
obligation to supervise under sections 9(e) and 10 is construed to include a duty to
contribute financial assistance for living expenses, the Department could be held
responsible for the living expenses of criminal defendants who have been placed
on parole or mandatory supervised release. See 730 ILCS 5/3-1-2(k), 3-2-2(1)(e),
3-3-7(a)(21) (West 2018).

¶ 85        This argument is fundamentally flawed. As explained above, a circuit court's
order requiring the Director to contribute financial assistance to a sexually
dangerous person on conditional release is not premised on his obligation to
supervise under sections 9(e) or 10. Instead, such an order finds its foundation in
the section 8 duties that are imposed on the Director in his role as guardian. And
those duties do not terminate until the sexually dangerous person has been found to
be no longer dangerous and is discharged. The language in the provisions cited by
the Director does not mirror that in section 8. None of those statutes explicitly states
that the Director shall be appointed as guardian and is required to keep safely
individuals on parole or mandatory supervised release, nor do they mandate that the
Director provide care and treatment to such individuals.

¶ 86     Next, the Director asserts that requiring him to contribute financial assistance to a sexually dangerous person on conditional release cannot be justified under section 5-6-4(d) of the Unified Code of Corrections (*id.* § 5-6-4(d)). In support, the Director cites the appellate court's comment that, if Kastman could not afford sex offender treatment or other conditions of his release, he could be recommitted for "blamelessly violat[ing]" those conditions based on his "inability to pay." 2021 IL App (2d) 210158, ¶ 22.

¶ 87     The Director correctly points out that a sexually dangerous person's *blameless* inability to pay may not serve as grounds for recommitment. Proceedings to revoke conditional release are conducted under section 5-6-4, which provides that revocation may not be ordered for a person's failure to satisfy "financial obligations" placed on him "unless such failure is due to his willful refusal to pay" (730 ILCS 5/5-6-4(d) (West 2018)). Therefore, the Director argues, Kastman's inability to pay for sex offender treatment or any of the other requirements in the conditional release order would not be grounds for his recommitment unless the State could prove that his failure to pay was "voluntary, conscious and intentional."

¶ 88     The Director's argument is all well and good as far as it goes. But it does not actually answer the question that was presented to the circuit court in this case and that forms the foundation of this appeal. The issue is whether the circuit court has authority to order the Director to provide financial assistance to cover the treatment costs and living expenses that Kastman had borne for approximately five years but could no longer afford based on his financial situation.

¶ 89     A sexually dangerous person on conditional release must undergo treatment and must reside in appropriate housing. If he cannot do either of those things simply because he cannot afford to cover the costs, then a circuit court could find him to be in violation of the terms of the conditional release order. Since appropriate housing is a requirement for conditional release, it should be treated in the same manner and according to the same standards as other statutory requirements such as appropriate treatment by an approved provider. Therefore, the responsibility to cover the cost of appropriate housing should be based on the sexually dangerous person's ability to pay.

¶ 90     We are unsure how the Director reconciles his argument as it relates to indigent individuals. This court has held that "[i]t is inconceivable" that a sexually

dangerous person who is indigent would be precluded from establishing his recovery and right to discharge based on the fact that he is unable to obtain psychiatric evidence to support his application. *Olmstead*, 32 Ill. 2d at 314. Notably, the Director has no answer to the question of whether a sexually dangerous person who is indigent may be ineligible for conditional release based solely on his financial instability. It is unclear from the Director's argument whether those persons are required to remain in the institutional setting because of their financial instability, despite the fact that they may appear to be no longer dangerous. If this were the case, then only sexually dangerous persons who have adequate funds would be eligible for conditional release. And even if a sexually dangerous person has some access to funds when the conditional release order is entered—as was true for Kastman in this case—the Director does not explain how that person can remain on conditional release if he depletes his funds and cannot afford to continue paying the necessary treatment costs and living expenses.

¶ 91    The Director's argument has not posited any solution to that dilemma except to say that he should not—indeed, cannot—be ordered to provide financial assistance. But, of course, the terms of section 17 of the Management Board Act and section 40(b)(6) of the Sexually Violent Persons Commitment Act indicate otherwise by recognizing that a sex offender's ability to pay is a relevant consideration in deciding who should bear the expense of treatment costs. In the absence of a clear statutory directive, we do not believe the legislature intended that only financially stable individuals are eligible for conditional release under the Act.

¶ 92    The Director also claims that requiring him to provide financial assistance is inconsistent with the purposes of conditional release. According to the Director, a purpose of conditional release is to allow the circuit court to determine if a sexually dangerous person is capable of functioning outside an institutional setting before discharging him.

¶ 93    We reject this argument because it blurs the critical distinction between financial instability and the need for supervision to protect the public. These are not the same thing. Nothing in the Act requires that a sexually dangerous person on conditional release be self-supporting. And there is no statutory language that addresses the circumstance where a sexually dangerous person on conditional release might appear no longer to be dangerous but require financial assistance to

live outside of an institutional setting. The obligation to supervise imposed on the Director derives from his responsibilities as guardian, which are premised on the mental disorder that formed the basis for the sexually dangerous person's commitment in the first place. The ability to pay for treatment costs and living expenses is a purely economic question that need not be directly related to the sexually dangerous person's level of recovery or his need for supervision outside of the institutional setting.

¶ 94　　The Director further asserts that requiring him to pay for a sexually dangerous person's living expenses would undermine the Act's goal of rehabilitation by discouraging the person from pursuing full recovery. According to the Director, it would be illogical to conclude that the legislature intended to create a financial incentive that undermines the Act's goal of rehabilitation. This contention is not persuasive.

¶ 95　　The restrictions on the freedom of a sexually dangerous person placed on conditional release are numerous and intrusive. We find it highly unlikely that a sexually dangerous person would voluntarily choose to continue to endure those restrictions rather than seeking full recovery and discharge, which would restore him to the enjoyment of his liberty and freedom from any supervision by the Director.

¶ 96　　The Director also claims that, although section 10 permits him to petition for conditional release of a sexually dangerous person, he does not have explicit authority to petition for a discharge. In the Director's view, it would be absurd to conclude that the General Assembly established a method for the Director to petition for the conditional release of a sexually dangerous person but intended that he would remain responsible for providing care and treatment, and keeping safely, the sexually dangerous person if the petition is granted.

¶ 97　　Contrary to the Director's assertion, we find nothing absurd in this interpretation. The duties imposed under section 8 are clear. A petition for conditional release filed under section 10 is not—and cannot be used as—a means to relieve the Director of his section 8 obligations. We are confident that the Director will initiate section 10 proceedings only in appropriate circumstances, recognizing that his section 8 duties remain in effect as specified by the circuit court in the conditional release order. To hold otherwise would create a financial

incentive on the part of the Director to commence section 10 proceedings in order to avoid his section 8 duties and the costs associated with them.

¶ 98    The Director's public policy arguments do not compel us to conclude that the circuit court lacked authority to order the Director to contribute financial assistance toward Kastman's treatment costs and living expenses—which is based on the plain language of the Act.

¶ 99    We caution that this decision is limited to the provisions in the Act, which explicitly require the Director to keep safely sexually dangerous persons and to provide those individuals with care and treatment designed to effect recovery. Our decision should not be understood to alter the law governing the duties of guardians appointed in other contexts, such as those who serve as guardian of a person pursuant to section 11a-17 of the Probate Act of 1975. See 755 ILCS 5/11a-17 (West 2018).

¶ 100                      G. Director's Challenges to Other Aspects
                              of the Appellate Court's Decision

¶ 101    As a final matter, we note that the Director critiques certain portions of the appellate court's analysis and argues that they were based on improper considerations. We need not address these challenges. Any infirmities in the appellate court's reasoning do not change our construction of the Act. Our task is to review the judgment of the appellate court, regardless of whether the reasoning it employed was correct. *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 44 (citing *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995)); *In re Rita P.*, 2014 IL 115798, ¶ 51.

¶ 102    For the reasons set forth above, we conclude that the appellate court reached the proper conclusion in holding that the circuit court has authority to order the Director to contribute financial assistance to Kastman while on conditional release. In light of that disposition, we need not address Kastman's claim that the Director's argument pertaining to the recommitment process set forth in sections 9(e) and 10 would render those statutory proceedings unconstitutional. See *People ex rel. Madigan v. Stateline Recycling, LLC*, 2020 IL 124417, ¶ 38 (recognizing that courts must avoid reaching constitutional issues when a case can be decided on

nonconstitutional grounds); *Johnson v. Department of State Police*, 2020 IL 124213, ¶ 13 (same).

¶ 103                                III. CONCLUSION

¶ 104     In sum, we hold that the circuit court has authority under the Act to order the Director to contribute financial assistance to cover the treatment costs and living expenses of a sexually dangerous person on conditional release. For the foregoing reasons, we affirm the judgment of the appellate court, which affirmed the judgment of the circuit court.

¶ 105     Judgments affirmed.

¶ 106     JUSTICE HOLDER WHITE took no part in the consideration or decision of this case.